**STATE of Missouri, Respondent,**

v.

**Bernardo O. COSTA, Appellant.**

**No. WD 56095.**

Missouri Court of Appeals,
Western District.

Nov. 30, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 1, 2000.

Application for Transfer Denied
March 21, 2000.

---

Gary E. Brotherton, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Krista D. Boston, Asst. Atty. Gen., Jefferson City, for respondent.

Before ALBERT A. RIEDERER, Presiding Judge, JAMES M. SMART, Jr., Judge, and JOSEPH M. ELLIS, Judge.

ALBERT A. RIEDERER, Presiding Judge.

Appellant Bernardo O. Costa appeals from his conviction for statutory rape, Section 566.032.[1] Appellant was sentenced as a persistent sexual offender, Section 558.018, to life imprisonment. Appellant asserts three points of error: (1) That the trial court erred and abused its discretion by failing to declare a mistrial during voir dire because of a remark made by the

---

1. All statutory references are to RSMo 1994, unless otherwise indicated.

State to the venire panel; (2) That the trial court erred and abused its discretion in not declaring a mistrial when Melissa Welpman testified that Appellant has hit his wife; and (3) That the trial court erred and abused its discretion in admitting as evidence Jennifer's hearsay statements to Melissa Welpman, Ashley Curry, Lea Rear, Linda Brock, Loletta Combs and Dr. Lori Frasier.

Because we find that: (1) The trial court's action in directing the jury panel to disregard the remark made by the State to the venire panel was sufficient to remove any prejudice; (2) Appellant was not prejudiced by the testimony of Melissa Welpman and that the trial court's instruction to the jury to disregard the testimony was reasonable; and (3) There was no abuse of discretion in admitting the hearsay statements made by Jennifer to the six witnesses allowed to testify as to her out of court statements. We affirm.

### Factual and Procedural Background

On February 26, 1997, Jennifer Costa, Appellant's six-year-old daughter, was scratching between her legs during kindergarten class. Jennifer's teacher, Linda Brock, sent her to the school nurse. Lyla Ramirez, the school nurse, initially checked Jennifer's head for head lice. Finding none, she sent Jennifer back to class with a note stating that she checked her head and did not find any signs of lice. A teacher's aide brought Jennifer back to the nurse and told her she was looking in the wrong place. The nurse asked Jennifer where she itched and Jennifer pointed between her legs. The nurse asked Jennifer to take her pants down and show her. She pointed to a spot on the inside of her labia. The nurse extracted what appeared to be a pubic louse, and sent Jennifer back to class. Given the location and nature of the louse, the nurse made a hotline call to the Division of Family Services ("DFS"). DFS dispatched Melissa Welpman, a social worker with DFS to the school to investigate the hotline call. Ashley Curry, an intern with DFS, accompanied Welpman to the school. Welpman and Curry arranged to meet Jennifer in an office at the school. Welpman testified at trial that the following questions and answers occurred during the interview. Welpman asked Jennifer if she had an itch and asked her to show her where. Jennifer pointed between her legs. Welpman asked Jennifer if she knew the difference between good touch and bad touch. Jennifer responded that she knew the difference. Welpman asked Jennifer if anyone had ever touched her in a bad way. Jennifer avoided answering the question and became "antsy." After repeated questioning by Welpman, Jennifer said that she had been touched in a bad way. Welpman then asked Jennifer who had touched her in a bad way and Jennifer replied, "my daddy." Welpman asked Jennifer what her daddy did and Jennifer said that "he takes me downstairs; takes my panties off; takes his panties off, and gets on top of me." Welpman asked Jennifer what it felt like when he got on top of her and she replied that "it hurts." Jennifer described Appellant's genitalia as his "thing" and said that "it was wet and it was hard." Welpman asked if her daddy had done this to anyone else and she said, "just mommy." After Welpman finished questioning Jennifer, she spoke with Jennifer's mother, Kathy Costa. Welpman talked to Mrs. Costa about Jennifer's revelations concerning what her father had done. Welpman told Mrs. Costa not to discuss anything with Jennifer. Welpman also explained to Mrs. Costa that she would be setting up a videotaped interview with Jennifer for the next day and would schedule a SAFE exam. Welpman allowed Mrs. Costa to take Jennifer home that evening since Appellant would not be home until the weekend.

Mrs. Costa took Jennifer home and asked her if she was harmed in any way by Appellant. Mrs. Costa testified that Jennifer told her no. Mrs. Costa also testified that she told Jennifer that her daddy would go to jail if she lied, and told her to tell the truth. Mrs. Costa discussed the

situation with her sister Beth and Appellant's brother Benjamin, who also lived at the residence. They decided to take Jennifer to a doctor that evening. Mrs. Costa took Jennifer to the emergency room at Fitzgibbon Memorial Hospital. Jennifer was examined by Dr. Barnum. He diagnosed Jennifer with vaginal itching and inflammation and recommended the use of cream for the irritation.

The next day, February 27, 1997, at 11:00 A.M., a police officer arrived at the Costa residence and took all three of Mrs. Costa's and Appellant's children, Jennifer, Layla and Bernard, Jr., into protective custody with DFS. All three of the children were placed with Chris and Lea Rear. That same day, in the early evening, Welpman and Cindy Williams, a social worker, questioned Jennifer in a videotaped interview.

On March 3, 1997, Welpman took Jennifer to see Dr. Scott for a SAFE examination. Dr. Scott determined that the dimensions of Jennifer's hymenal opening were double the size for a child of Jennifer's age, that Jennifer's hymenal ring was intact, though rough and thickened, and that her vaginal vault had chronic irritation and lacked vascularity, signaling that something had penetrated past the hymen. Based on these findings, it was Dr. Scott's opinion that Jennifer was sexually molested.

Jennifer and her siblings were placed with Christopher and Lea Rear. Mr. Rear testified that Jennifer was affectionate, but would do a humping motion on him when he hugged her. Mr. Rear testified that when Jennifer first arrived at their home he would bathe her, but that he quit doing so because Jennifer would masturbate while she was in the tub. Mr. Rear also testified that Jennifer had terrible nightmares. Mrs. Rear testified that Jennifer has masturbated in front of the other children and in the bathtub, and that Jennifer has masturbated on occasion until she bled. Mrs. Rear also testified that Jennifer acted aggressively towards the other

children in the house by punching, shoving, hitting and spitting at them. On one occasion, when the children were talking about the rules they had in the Costa household, Jennifer told Mrs. Rear that her father had hurt her. Mrs. Rear testified that Jennifer told her that Appellant had gotten on top of her and went up and down, that he hurt her and she cried, and that he told her to shut up and not tell anyone. Mrs. Rear shared this information with Welpman, who subsequently put Jennifer into counseling with Loletta Combs. On March 24, 1997, Jennifer began counseling sessions with Combs.

On May 19, 1997, Dr. Lori Frasier examined Jennifer. She testified that Jennifer's hymenal ring was intact and very thin, and that the opening of the hymen appeared to be large. Dr. Frasier also testified that it is possible for there to have been penile penetration of Jennifer without any physical evidence. Dr. Frasier also interviewed Jennifer. When Dr. Frasier asked her if she knew the difference between the truth and a lie and if she knew the difference between good touch and bad touch, Jennifer told her that she did. Dr. Frasier asked Jennifer if she had been touched and Jennifer shook her head no, and then began shaking her head yes. Dr. Frasier asked Jennifer where she was touched and she pointed to her genital area. Dr. Frasier asked Jennifer who touched her and Jennifer said, "her daddy." When Dr. Frasier asked Jennifer what Appellant had touched her with she said, "his privates." Jennifer would not tell Dr. Frasier anything further, so she resumed the physical exam. Based on her entire examination of Jennifer, it was Dr. Frasier's opinion that Jennifer had been sexually abused.

Peggy Carroll, Jennifer's first grade teacher, testified that on occasion Jennifer would slide underneath her desk and get into a fetal position and "drift off." She also testified that Jennifer would cut herself with scissors and put glue on herself and pick it off. She further testified that

Jennifer was a "loner," but on the school playground she acted aggressively, especially pursuing one particular boy whom she routinely jumped on and wrapped herself around.

On May 22, 1997, Appellant was charged by information, as a prior offender, Section 558.016, and as a predatory sexual offender, Section 558.018, with statutory rape in the first degree, Section 566.032. On September 15, 1997, the State filed a motion to order a video recording of Jennifer, excluding Appellant from the proceeding, claiming that Jennifer would suffer significant emotional or psychological trauma from testifying in the presence of Appellant. The Circuit Court of Carroll County heard the motion on October 10, 1997, and issued an order dated October 21, 1997, stating that it found, pursuant to Section 491.680 and Section 491.685, that significant emotional or psychological trauma would result from Jennifer testifying in the personal presence of the Appellant either at trial or in a deposition, and that Jennifer was therefore unavailable as a witness. The trial court thus ordered a videotaped deposition of Jennifer's testimony to be used as substantive evidence at trial.

On November 12, 1997, the court heard the State's motion requesting an order for the admission of hearsay statements made by Jennifer to Loletta Combs, Melissa Welpman, Linda Brock and Lee Rear, pursuant to Section 491.075. On June 11, 1998, the circuit court issued an order finding that "the time content and circumstances of the statements provide[ed] sufficient indicia of reliability, and that the child is otherwise physically available as a witness but that the significant emotional or psychological trauma which would result from testifying in the personal presence of the defendant makes Jennifer Costa unavailable as a witness at the time of the criminal proceeding." The court also determined that these out of court statements were admissible as substantive evidence.

The jury found Appellant guilty and on July 15, 1998, Appellant was sentenced to life imprisonment without the possibility for parole for 30 years. This appeal ensued.

## I.

■ Appellant argues in his first point that the trial court erred and abused its discretion by failing to declare a mistrial during voir dire when the State told the venire panel that "Judge Moentmann has determined that it would be too psychologically traumatizing for Jennifer Costa to testify."

■ This court reviews the denial of a motion for mistrial for abuse of discretion. *State v. Rodriguez*, 985 S.W.2d 863, 865 (Mo.App.1998). For a finding of abuse of discretion, the ruling must offend the logic of the circumstances, or be arbitrary and unreasonable. *Id.*

The following colloquy took place during the State's voir dire:

> *Prosecutor*: Could we continue a little bit? *Judge Moentmann has determined that it would be too psychologically traumatizing for Jennifer Costa to testify—*
>
> *Defense Counsel*: Your Honor, I'm going to— your Honor may we approach the bench again, please.
>
> (The attorneys approach the bench out of the hearing of the jury, as follows:)
>
> *Defense Counsel*: Your Honor, that was just totally out of line. He has indicated to the jury the Court's finding regarding 491, which was made outside the hearing of the jury. It should have been kept from the jury. He has told, in effect, the jury that Jennifer, or that the Court has found that Jennifer Costa was reliable, and that is totally inappropriate. And *I will ask for a mistrial at this point, impanel another jury, or in the alternative, instruct the jury to disregard that.*

*Prosecutor* : James, what we're getting at here is something we're going to be asking this jury— we're going to explain to the jury that it is a child, and being in these confines, that it's very difficult for a child. What I'm going to be asking is, can they give fair weight to the video testimony in lieu of the child appearing live in the court room.

*Defense Counsel* : Judge, that's not my objection. My objection is that counsel directly told the jury that this Court found the child's testimony reliable. And I object to that.

*Prosecutor* : No, I never said reliable.

*The Court* : Okay. I think you can ask the question without referring to what we did outside of the jury as to the need for the closed testimony.

*Prosecutor* : I'm just going to specifically—

*The Court* : You don't have to inform them that there was a hearing.

*Prosecutor* : Okay.

*The Court* : And that I made a ruling on that fact.

*Prosecutor* : Okay.

*Defense Counsel* : Judge, the problem is the bell's been rung and this jury has heard it; and I think my client is entitled to a new panel at this point.

*The Court* : *I will instruct the jury to disregard the last question.*

*Prosecutor* : Just so we're clear, what I'm going to rephrase to is I'm going to say Jennifer Costa might not be testifying; but will be on a videotape testimony, and ask the question if there would be anybody who could not give full weight to the testimony simply because it is videotaped as opposed to her appearing in here.

*Defense Counsel* : Judge, I don't have a problem with that; but, again, I renew my objection and my request to have the jury panel struck and start over because the bell has been rung.

(The proceedings returned to open court)

*The Court* : *The Court has sustained the last objection, and the Court is going to direct the jury panel to disregard the last question asked by [the Prosecutor].*

(emphasis supplied).

■■■ "Even if the voir dire statement of the prosecutor was improper, the drastic remedy of mistrial should not be granted unless the prejudice of the remarks cannot be removed by other remedial action." *State v. Smith*, 632 S.W.2d 36, 38 (Mo.App.1982). The trial court has great discretion in deciding whether unwarranted prosecutorial conduct is so prejudicial that a mistrial is the only appropriate remedy. *Id.* Here, the trial court determined that the proper remedial action was to direct the jury to disregard the comment made by the State that it would be too psychologically traumatizing for Jennifer Costa to testify. This was the same action that defense counsel asked the court to take, if the court did not declare a mistrial. Defense counsel argued that by making the statement about Jennifer, the State "directly told the jury that this Court found the child's testimony reliable." We disagree. The remark by the State was indeed unwarranted and objectionable. However, it stretches credulity to argue that it was tantamount to saying the judge had determined the child's testimony to be reliable. It was but one statement in voir dire and the court took immediate corrective action. The trial court's action in directing the jury panel to disregard the remark was sufficient to remove any prejudice. Thus, we find no abuse of discretion. Point I is denied.

## II.

■■ Appellant argues in his second point that the trial court erred and abused its discretion in not declaring a mistrial when Melissa Welpman testified that Appellant has hit his wife, and argues that this was inadmissible evidence of an uncharged bad act.

This court reviews the denial of a motion for mistrial for abuse of discretion. *Rodriguez*, 985 S.W.2d at 865. For a finding of abuse of discretion, the ruling must offend the logic of the circumstances, or be arbitrary and unreasonable. *Id.* During Welpman's direct examination at trial, the following colloquy occurred:

*Prosecutor*: What did you do then? Or what was your next question?

*Melissa Welpman*: We went over some background with the family. Since we only had an hour to get to her, we had not had any knowledge of the family. I asked her family situation. She said that her mom and dad, brother, sister, and aunt and uncle lived with her, or stayed there occasionally. We asked her sleeping arrangements. *We got into if there was any domestic abuse, any physical abuse, and she said that her dad sometimes, just kind— sometimes hitting her mom sometimes.*

*Defense Counsel*: Your Honor, I'm going to object at this point. May we approach the bench.

(The attorneys approach the bench, and the following proceedings were had at the bench out of the hearing of the jury, as follows

*Defense Counsel*: I had no idea this was coming. What we've got here is evidence of other crimes. We've got highly irrelevant material, highly prejudicial material; and its not responsive. And, certainly, if it was responsive, then he's asking for objectionable material, and he knew it.

*Prosecutor*: No, it's in the report, but I didn't expect her to express it either. If the Court will order—

*Defense Counsel*: I'll ask for a mistrial, Judge.

*Prosecutor*: I'm ready to move on. What I'm trying to say is, I did not know that she was going to say this at all. And I'd ask the Court to just instruct to disregard the last statement, and I'll move on around, and just get to it. She's just narrating the way it all happened that day.

*Defense Counsel*: Judge, I'm asking for a mistrial. There are clearly prejudicial statements, with domestic violence being the issue that it is today. He has rung the bell and I cannot un-ring it, and neither can this Court.

(The proceedings returned to open court.)

*The Court*: The Court is going to sustain the last objection to the testimony of the witness; and the Court is going to advise the jury to disregard the witness's statement as to the conduct between the mother and the father.

A mistrial is a drastic remedy that should be granted in only extraordinary circumstances. *State v. Smith*, 934 S.W.2d 318, 320 (Mo.App.1996). The trial court is in the best position to determine whether the incident caused prejudice. *Id.* In analyzing the prejudicial effect of an uninvited reference to other crimes evidence, this court examines five factors:

(1) whether the statement was, in fact, voluntary and unresponsive [to the prosecutor's questioning if the prosecutor asked the question] ... or whether the prosecution "deliberately attempted to elicit" the comments ...; (2) whether the statement was singular and isolated, and whether it was emphasized or magnified by the prosecution, ...; (3) whether the remarks were vague and indefinite, or whether they made specific reference to crimes committed by the accused, ...; (4) whether the court promptly sustained defense counsel's objection to the statement, ... and instructed the jury to disregard the volunteered statement, ...; and (5) whether in view of the other evidence presented and the strength of the state's case, it appeared that the comment "played a decisive role in the determination of guilt."

*Id.* at 320–21 (citing, *State v. Silas*, 885 S.W.2d 716, 720 (Mo.App.1994). Applying these factors to this case, we do not find

that the remarks made by Welpman were prejudicial to Appellant. The first factor is whether the statement was voluntary and unresponsive. The State asked Welpman, "What did you do then? Or what was your next question?" Welpman testified generally about the family situation at the house and then made the statement at issue. The State did not "deliberately attempt to elicit" this comment from Welpman, it was voluntarily given. As to the second factor, the comment was singular and isolated, it was not emphasized or magnified by the prosecution. The third factor is whether the remarks were vague and indefinite. Welpman's comment that Appellant sometimes hit his wife was not vague and indefinite, but rather a reference to a specific crime. However, the comment did not refer to a specific incident and did not specify how many times he allegedly hit her. Regarding the fourth factor, the court promptly sustained defense counsel's objection to the statement and instructed the jury to disregard the volunteered statement. The fifth, and final factor, is whether in view of the other evidence presented and the strength of the State's case, it appeared that the comment "played a decisive role in the determination of guilt." There was a substantial amount of evidence presented in this case concerning the crime charged, and Welpman's voluntary, isolated comment pales in comparison. Dr. Scott and Dr. Frasier both testified as to their medical findings and opinions. Dr. Scott performed a SAFE examination, and based on his findings that Jennifer's hymenal opening was double the size for a child her age and that her vaginal vault had chronic irritation and lacked vascularity, it was Dr. Scott's opinion that Jennifer was sexually molested. Dr. Lori Frasier also examined Jennifer. She testified that Jennifer's hymenal ring was intact and very thin, and that the opening of the hymen appeared to be large and that it was possible for there to have been penile penetration of Jennifer without any physical evidence. Jennifer told Dr. Frasier during an interview that she was

touched in her genital area by "her daddy" with "his privates." Based on her entire examination of Jennifer, it was Dr. Frasier's opinion that Jennifer had been sexually abused. Social workers, counselors and witnesses also testified about their experiences and observations concerning Jennifer. Melissa Welpman testified that Jennifer told her, in detail, that her daddy had touched her in a bad way. Lea Rear testified that Jennifer masturbated, had nightmares, acted aggressively toward other children in the home, and told her that her father had sexually molested her. Loletta Combs testified that Jennifer told her that her father had touched her vagina with his wienie, finger and tongue.

This would be a close case if the analysis ended with the first four factors, for they are not conclusive. The addition of the fifth factor, however, leads us to conclude that the other evidence of guilt is strong enough that the improper comment did not play a decisive role in the determination of guilt. Based on the foregoing factors, we find that Appellant was not prejudiced by the testimony and that the trial court's instruction to the jury to disregard the testimony was reasonable. Therefore, the trial court did not abuse its discretion in denying a mistrial. Point II is denied.

### III.

Appellant claims in his third point that the trial court erred and abused its discretion in admitting as evidence Jennifer's hearsay statements to Melissa Welpman, Ashley Curry, Lea Rear, Linda Brock, Loletta Combs and Dr. Lori Frasier, because the evidence violated his rights to confrontation, due process and a fair trial.

■■■■ Our review of the trial court's decision to admit hearsay testimony under Section 491.075 is limited to a determination of whether such admission amounted to an abuse of discretion. *State v. Werneke*, 958 S.W.2d 314, 318 (Mo.App.1997).

Judicial discretion is abused when the trial court's ruling is clearly against the

logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. *Anglim v. Missouri Pacific R.R. Co.*, 832 S.W.2d 298, 303 (Mo.1992). The evidence is viewed in the light most favorable to the result of the trial court. *Id.*

Section 491.075 states in pertinent part: A statement made by a child under the age of twelve ... is admissible in evidence in criminal proceedings ... as substantive evidence to prove the truth of the matter asserted if:

(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provided sufficient indicia of reliability; and

(2)(a) The child testifies at the proceedings; or

(b) The child is unavailable as a witness; or

(c) The child is otherwise physically available as a witness but the court finds that the significant emotional or psychological trauma which would result from testifying in the personal presence of the defendant makes the child unavailable as a witness at the time of the criminal proceeding.

As stated *supra*, the circuit court issued an order finding that under Section 491.075, the statements made to the aforementioned individuals by Jennifer provided sufficient indicia of reliability, and that while Jennifer was otherwise physically available as a witness, the significant emotional or psychological trauma which would have resulted from testifying in the personal presence of the defendant made her unavailable as a witness. Thus, the out of court statements Jennifer made to Melissa Welpman, Ashley Curry, Lea Rear, Linda Brock, Loletta Combs and Dr. Lori Frasi-

er were admitted into evidence over Appellant's objections.

The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witness against him." U.S. CONST. amend. XI. The Supreme Court has consistently held that the Confrontation Clause does not necessarily prohibit that admission of hearsay statements against criminal defendants "even though the admission of such statements might be thought to violate the literal terms of the Clause." *Idaho v.Wright*, 497 U.S. 805, 110 S.Ct. 3139, 3145, 111 L.Ed.2d 638 (1990). The Court also states in *Wright* that a literal interpretation of the Confrontation Clause could bar the use of any out of court statements where the declarant is unavailable and that such a view was rejected and deemed "unintended and to extreme." *Id.* at 3146. The Court in *Wright* cautions that the prohibitions of the Confrontation Clause should not be equated with the general rule prohibiting the admission of hearsay statements, and reminds us that the Confrontation Clause bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule. *Id.* In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980), the Supreme Court set forth a general approach for determining when statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause. First, the prosecution must either produce, or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. Second, once a witness is shown to be unavailable, "his statement is admissible only if it bears adequate 'indicia of reliability.'" *Id.* at 2538–39. Reliability can be inferred, without more, if the evidence falls within a firmly rooted hearsay exception. *Id.* Firmly rooted hearsay exceptions include, for example, excited utterances and dying declarations. "[I]f cer-

tain hearsay evidence does not fall within a 'firmly rooted hearsay exception', and is thus presumptively unreliable and inadmissible for Confrontation Clause purposes, it may nonetheless meet Confrontation Clause reliability standards if it is supported by 'a showing of particularized guarantees of trustworthiness.'" *Wright,* 110 S.Ct. at 3147. "'[P]articularized guarantees of trustworthiness' must be shown from the totality of the circumstances, but we think the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief." *Wright,* 110 S.Ct. at 3148. The nonexclusive list of factors the trial court should consider when determining whether out of court statements made by a child witness in a child sexual abuse case are sufficiently reliable to allow their admission include: (1) spontaneity and consistent repetition; (2) mental state of the declarant; (3) lack of motive to fabricate; and (4) use of terminology unexpected of a child of similar age. *Id.* at 3150 (citations omitted). The Court in *Wright* stated that while it declined to adopt a mechanical test for determining "particularized guarantees of trustworthiness" under the Confrontation Clause, it determined that "the unifying principal is that these factors relate to whether the child declarant was particularly likely to be telling the truth when the statement was made." *Id.*

To determine whether Jennifer's out of court statements to Melissa Welpman, Ashley Curry, Lea Rear, Linda Brock, Loletta Combs and Dr. Lori Frasier had "particularized guarantees of trustworthiness", we must analyze the testimony given by each of the witnesses.

Melissa Welpman and Cindy Williams interviewed Jennifer on videotape February 27, 1999. A substantial portion of Appellant's brief is devoted to criticism of the interviewing techniques used by Welpman and Williams in that videotape. Appellant's criticisms of those interviewing techniques will be considered as part of the totality of the circumstances in this court's analysis of the hearsay statements Jennifer made the day before the videotape, because Welpman testified that the same techniques were used in that earlier interview of Jennifer. However, Appellant does not complain about the videotape itself because it was admitted into evidence and played for the jury without objection.

Melissa Welpman testified at trial about her initial interview with Jennifer at the school on February 26, 1997. Welpman testified that the interview occurred in a comfortable environment and that she took some time to get to know Jennifer before asking her any questions. During the interview, Jennifer told Welpman that she knew the difference between good touch and bad touch. Welpman asked if anyone had touched her in a bad way. Jennifer became "antsy", turned around in her chair, looked at the walls and generally avoided the question. After what Welpman described as repeated questioning, she asked Jennifer who touched her in a bad way and she said, "my daddy." Jennifer continued, "He takes me downstairs; takes my panties off; takes his panties off, and gets on top of me." Welpman asked her what it felt like when her daddy got on top of her and she said, "it hurts," and that "it was wet and it was hard." When Welpman asked her if he had done this to anybody else she replied, "just mommy." Welpman also testified that Jennifer referred to Appellant's penis as his "thing," and she said that he puts his privates on top of her privates.

Ashley Curry testified at trial that during the initial interview at the school on February 26, 1997, Jennifer said "her daddy" touched her in a bad way. Curry testified that Jennifer said it happened in the basement he pulls her panties off and he pulls his panties off and he gets on top of her. Jennifer said that it felt wet and hard and that it hurt. When asked if he did this to anyone else, Jennifer replied, "just mommy." Curry also testified that Jennifer said her dad told her not to tell,

but that she told her mom and her mom told her she would not tell her dad she told her.

The initial interview of Jennifer at the school occurred in a neutral setting. Welpman and Curry took some time to get to know Jennifer before questioning her. These factors weigh in favor of trustworthiness. However, when Welpman asked Jennifer if anyone had ever touched her in a bad way, it took repeated questioning before Jennifer would say someone had touched her in a bad way. This weighs against trustworthiness. After Jennifer told Welpman and Curry that Appellant took her downstairs, took her panties off and his panties off and got on top of her, she became fidgety again and did not want to answer any further questions. The only other information Jennifer gave was that it hurts when he gets on top of her and that it felt wet and hard. Jennifer would not give any further details. Jennifer's remarks were not spontaneous, in that Welpman testified that she had to repeatedly question Jennifer before she answered. This also weighs against trustworthiness. Jennifer's demeanor during the interview shows that she was uncomfortable. However, she was alert and able to communicate. Much of her hesitation was likely attributable to embarrassment. And her answers were consistently the same. On balance, examining the totality of the circumstances, it appears Jennifer was likely to be telling the truth when talking with Welpman and Williams.

Lea Rear, Jennifer's foster parent, testified at trial that in March of 1997, she was sitting in her living room where the Costa children and one of her children were playing. The Costa children started talking about the method of discipline used in their home. Without prompting, Jennifer told Mrs. Rear that her dad had hurt her. Jennifer told Mrs. Rear that her dad got on top of her, went up and down and that she cried. Jennifer also said that Appellant told her to shut up and not to tell anyone. Jennifer began crying, so Mrs. Rear put her arms around her and told her that she would keep her safe. Mrs. Rear also testified that Loletta Combs had told her that Jennifer was not talking during her therapy sessions about any of the issues they were there to work on. Combs asked Mrs. Rear to ask Jennifer point blank questions. On July 15, 1997, while Mrs. Rear and Jennifer were riding in the car, she asked Jennifer if her dad had touched her and she said "yes." Mrs. Rear asked her, "what did he touch you with, his finger?" Jennifer said no, he had touched her with his tongue. Mrs. Rear asked, "In your ear?" Jennifer said no, he had touched her privates.

Jennifer's revelations to Mrs. Rear in the living room were spontaneous. Mrs. Rear had never asked Jennifer any questions about the subject at that time or previously. Jennifer offered the information freely and was emotional after she disclosed it. Further, the statements were internally consistent. They were not made under any circumstances that would indicate any motive to fabricate. All of these factors together weigh strongly in favor of trustworthiness. On the other hand, Mrs. Rear's conversation with Jennifer in the car after a session with Combs was contrived. Combs was concerned that she was not getting anywhere with Jennifer so she asked Mrs. Rear to ask her point blank questions. The questions were direct and leading. After the conversation, Mrs. Rear called Combs to tell her what Jennifer had said. This, of course, weighs against trustworthiness. The spontaneous conversations were unquestionably properly admitted because under the totality of the circumstances, Jennifer was very likely telling the truth. Although the second set of statements were not as trustworthy, the fact that those statements were consistent with previous statements Jennifer made to Mrs. Rear makes them less suspect. On balance, the totality of the circumstances indicates the statements were trustworthy, i.e., Jennifer was likely telling the truth.

Linda Brock, Jennifer's kindergarten teacher, testified at the Section 491.075 hearing that when Jennifer came back to school after the pubic louse incident, she told Jennifer to come talk to her anytime she felt like talking or visiting. Sometime in March of 1997, during rest time, Jennifer walked up to Brock and asked for a hug. Jennifer proceeded to tell Brock that she had gone down in the basement, and that her dad touched her in places that were private. Brock asked Jennifer what she did, and she said she told her mother. Brock asked Jennifer what her mother did, and Jennifer said her mother did not do anything. Jennifer's statements to Brock were spontaneous. Jennifer approached Brock and volunteered the information that her father touched her in places that were private. Brock did ask Jennifer a couple of questions after Jennifer's revelation, but she did not press her for further information. There was no motive present for fabrication. The statements were internally consistent and the terminology was appropriate. The totality of the circumstances surrounding these statements indicate that they were trustworthy, i.e., that Jennifer was likely telling the truth.

Loletta Combs testified at trial that during her session with Jennifer on March 31, 1997, she asked Jennifer why she was living with the Rears and Jennifer told her because her father had done something he was not supposed to do to kids. When Jennifer did not add anything further, Combs started using anatomical dolls. Combs told Jennifer that the dolls represented a family and she began talking to Jennifer about her family. Combs asked Jennifer to tell her again who had done something to her and she said, "her daddy." Combs asked Jennifer to show her with the dolls. Jennifer did not move. Combs took a doll and told Jennifer it was her daddy. Combs asked Jennifer if she remembered which doll she was. Jennifer did not respond. Combs held up a girl doll and told Jennifer it would be her. Combs then asked Jennifer to show her what had happened. Jennifer put the dolls close together in the air and then laid them down on a table. Combs asked Jennifer if how the dolls were on the table was how something had happened to her, and she said, "no, he was always on top." Jennifer then took the dolls and lined them up with the boy doll on top. Combs asked Jennifer if the clothes were left on or taken off and Jennifer said the clothes were on. Combs told Jennifer she was going to take the clothes off of the dolls so she could understand what she was trying to tell her happened. Combs handed the dolls back to Jennifer and asked her what happened. Jennifer took the dolls, placed them together, grabbed the daddy doll's buttocks and bounced it up and down. Combs asked Jennifer if her dad had bounced or moved like that on her and she said yes. Combs asked Jennifer to name the body parts that her dad had touched and Jennifer told her she did not know what they were called. Combs asked her if anybody had ever said the term private parts to her before. Jennifer said the school nurse had called them that. Combs asked Jennifer to point to the private parts on the doll. When showing Combs the penis on the male doll, Jennifer grabbed the penis and said, "This is daddy's." Combs asked Jennifer if her dad had touched her with his private parts and she said, "Yeah, he put it in." Combs asked Jennifer what she did when her dad touched her like that. Jennifer said she would cry and her dad would tell her to "stop that crying," imitating her dad's voice. Combs asked why she would cry and she said, "because it hurt." Combs asked what hurt and she said, "my private part." Combs asked if her dad said anything else and Jennifer said, "yeah, don't tell mommy, Sissy or Bubba," imitating her dad's voice. Combs testified that during the March 31, 1997 session, Jennifer was anxious, nervous and indicated that she was afraid.

Many of Jennifer's responses to questions at the March 31, 1997, session were prompted by Combs in some fashion. Al-

though Jennifer did offer some information completely on her own, most of the information was given only when prompted by a question or repeated questions. This weighs against trustworthiness. Combs' use of the anatomical dolls was more of a pressure tactic than an open ended questioning. Combs persisted when she did not get the response she wanted. Lack of spontaneity and continued pressure in questioning casts serious doubt on the trustworthiness of these statements. However, we note that the statements to Combs were consistent with statements given to others, and we have indicated that the totality of the circumstances of those other statements indicates Jennifer was telling the truth.

On balance, the statements made to Combs would not meet the test of particularized guarantees of trustworthiness, if it were not for the fact that these statements are so consistent with other statements which are trustworthy.

During a session on April 7, 1997, Jennifer told Combs that her dad touched her. When Combs asked where, Jennifer told her downstairs. Combs asked Jennifer what she would do and she said she would cry. When Combs asked Jennifer what was in the basement she did not reply. During a session on October 9, 1997, Combs testified, Jennifer was having problems with terminology for body parts. Combs had previously talked with Kathy Costa about what body parts were called in their home. Combs gave Jennifer choices of names for body parts. Jennifer picked the word "monkey" for her vagina, "tits" for breasts and "wienie" for penis. Jennifer drew a picture of the body parts. She drew her dad with a wienie and she drew herself with a monkey. Combs asked if her dad had put other things in her monkey and she said no. Combs asked if her dad had put other parts of his body in her monkey and she said his tongue and hand. Combs asked Jennifer to show her with the dolls. Jennifer undressed each doll from the waist down, pulled the tongue out of the man doll's mouth and put it inside the girl doll's vagina. Combs asked Jennifer about the hand and she isolated the right middle finger of the man doll and placed in the girl doll's vagina. During a session on May 4, 1998, Combs was talking with Jennifer about how things were going at the Rears. Combs asked Jennifer if Lea Rear had talked to her about touching herself. Combs then asked Jennifer how it felt to be touched there and Jennifer said that it hurt sometimes. Combs asked Jennifer who had touched her there and she said her dad had touched her there with his wienie, finger and tongue. Jennifer said it hurt when her dad touched her with his wienie, that it did not hurt when he touched her with his finger, and that it tickled when he touched her with his tongue. During a session on June 17, 1997, Jennifer drew a picture and said it was her house and that that was where something had happened to her. Jennifer identified herself in the picture and her dad. Jennifer showed Combs her dad's private part on the drawing.

At an unspecified session, Jennifer drew another picture. Jennifer said it was a picture of her dad and his private part. Combs asked if she had seen her dad's private part and she said, "yes, down in the basement." Combs asked her when and she said, "he took me down there." Combs asked where her dad's pants were and she said, "down on his legs." Combs asked Jennifer what her dad's private part looked like and she pointed to the picture.

Jennifer's statements to Combs during the April 7, October 9 and June 17 sessions were consistent with the statements she gave during the March 31 session. Jennifer reiterated that her dad touched her in the basement of their home, that it hurt when her dad touched her privates and that she would cry. Jennifer offered further information, at the prompting of Combs, that her dad touched her with his "wienie," finger and tongue.

Dr. Lori Frasier testified that she examined Jennifer on May 19, 1997. During

the interview portion of the examination, Dr. Frasier described Jennifer as having "the subdued effect," meaning she was quiet and soft spoken. Dr. Frasier asked Jennifer if she knew the difference between good touch and bad touch. Jennifer said that she did. Dr. Frasier asked Jennifer if she had ever been touched. Jennifer shook her head no, and then simultaneously shook her head yes. Dr. Frasier asked her where she had been touched and she quietly pointed to her genital area. Dr. Frasier asked her who touched her and she said in a whisper, "her daddy." Dr. Frasier asked Jennifer what he touched her with and she said, "his privates." Dr. Frasier asked Jennifer if she was touched in any other part of her body, and she shook her head no. Dr. Frasier testified that she tried to ask Jennifer how many times and where she was at the time, but that Jennifer became anxious, so she stopped the interview and went on to the medical exam.

Dr. Frasier's interview with Jennifer did not reveal any new information. Jennifer's statements were consistent with other statements she had made during previous interviews with others. Jennifer was not pressured, and she exhibited no motive for fabrication. The totality of the circumstances shows that these statements possess particularized guarantees of trustworthiness.

To summarize, of the six witnesses who testified about the statements made by Jennifer, some of them clearly possess particularized guarantees of trustworthiness, in that under the totality of the circumstances surrounding the statements, it appeared likely that Jennifer was telling the truth. The statements made to Combs were the least trustworthy, but they are also consistent with statements given to others, and, thus, it appears Jennifer was telling the truth to Combs, as well.

Jennifer's statements included a sexual vocabulary and a knowledge of sexual acts beyond what is usual or normal for a girl of similar age. As noted *supra, Idaho v.*

*Wright* includes as one of the factors in determining content-reliability analysis "the use of terminology unexpected of a child of similar age." *Id.* at 3150. The Missouri Supreme Court has concluded that this phrase means that when assessing content-reliability, courts must examine whether the child's knowledge of the subject matter, rather than the child's particular vocabulary or words, is unexpected in a child of similar age. *State v. Redman,* 916 S.W.2d 787, 791 (Mo. banc 1996). Jennifer's statements to various people, as well as the videotapes shown to the jury, demonstrate a knowledge of the subject matter unexpected of a child of similar age. She repeatedly recited, acted out and demonstrated that her father was on top of her and at different times penetrated her vaginally with his fingers, his penis and his tongue. While it is possible that she had learned some of her story, as suggested by Appellant, by figuring out what the adults wanted to hear, there is simply no evidence in this record to suggest even remotely that she could have gained this kind of knowledge of the subject matter from the adults to whom she was talking and who were talking to her. Jennifer's knowledge of sexual vocabulary and sexual acts is a factor that weighs heavily in favor of trustworthiness, for it indicates that Jennifer is likely telling the truth.

We conclude from the analysis of all of the statements, using the factors set forth in *Idaho v. Wright* and *State v. Redman,* that there is " 'an affirmative reason, arising from the circumstances in which the statement[s were] made, [that] provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial.' " *Id.* at 790 (citing, *Idaho v. Wright,* 110 S.Ct. at 3149–50). Or to state it differently, the evidence shows that the time, content, and circumstances of the statements provide sufficient indicia of reliability. *State v. Wright,* 751 S.W.2d 48, 52 (Mo. banc 1988).

## Conclusion

As noted above, our review of the trial court's decision to admit this hearsay testi-

mony is limited to a determination of whether such admission amounted to an abuse of discretion. *Werneke,* 958 S.W.2d at 318. The evidence here, however, shows that the trial court's ruling was not clearly against the logic of the circumstances then before the trial court. *Id.* Nor is the court's decision so arbitrary or unreasonable as to shock the sense of justice and indicate a lack of careful consideration. *Anglim,* 832 S.W.2d at 303. To the contrary, the admission of this evidence, under the foregoing analysis mandated by the Missouri Supreme Court and the United States Supreme Court, is to be viewed in the light most favorable to the decision of the trial court. We determine accordingly that there was no abuse of discretion in admitting the hearsay statements made by Jennifer to the six witnesses allowed to testify as to her out of court statements. The trial court did not err in allowing these statements into evidence. Point denied.

Judgment affirmed.

All concur.