STATE of Missouri, Respondent,

v.

Richard W. HECKENLIVELY,
Appellant.

No. WD 59159.

Missouri Court of Appeals,
Western District.

Submitted April 3, 2002.

June 25, 2002.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 25, 2002.

Application for Transfer Denied
Sept. 24, 2002.

Jeannie M. Willibey, Asst. Public Defender, Kansas City, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Attorney General, Kansas City, for Respondent.

Before PATRICIA BRECKENRIDGE, P.J., HAROLD L. LOWENSTEIN and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

Richard W. Heckenlively appeals his conviction of first degree statutory sodomy, pursuant to § 566.062, RSMo 1994, and first degree child molestation, § 566.067, RSMo 1994. For the sodomy conviction, the trial court sentenced Heckenlively, as a persistent and predatory sexual offender pursuant to § 558.018, to life imprisonment, without the possibility of parole for thirty years. The court also sentenced Heckenlively to a concurrent term of seven years imprisonment for first degree child molestation.

For the reasons set forth below, the judgment is affirmed in part. Because the statute authorizing sentencing as a predatory sexual offender did not become effective until after the commencement of the period of time during which Heckenlively committed the offenses in question, the sentence as a predatory sexual offender for first degree statutory sodomy is vacated, and the case is remanded for resentencing on that count.

## Statement of Facts

Richard Heckenlively was charged with one count of statutory sodomy in the first degree, as a persistent and predatory sexual offender, and with one count of child molestation in the first degree. The acts were alleged to have occurred between the dates of May 1, 1996, and January 14, 1997. The alleged victim of count I was Heckenlively's stepdaughter, B.S., whose birth date is September 10, 1990, and the alleged victim of count II was Heckenlively's daughter, B.H., whose birth date is March 2, 1993.

At trial, the State presented the following evidence. Mrs. Ira Heckenlively testified that in 1996, she and the appellant were married and the two of them were living with her three young children, including Heckenlively's stepdaughter, B.S., and his biological daughter, B.H., at 9th and Monroe in Kansas City, Missouri. She separated from Heckenlively on March 8, 1997.

On January 14, 1998, she discovered the two girls acting out sexually. Mrs. Heckenlively questioned the girls about what they were doing. The girls told her that, sometime in 1996, while they were all still living together, Heckenlively had taken the girls' clothes off and touched both of them in their vaginal area. After being made aware of the incident, Mrs. Heckenlively called the police.

Kansas City Police Officer Brian Ruch testified at trial that on January 14, 1998, he was dispatched to interview Mrs. Heckenlively and the two girls. After speaking with Mrs. Heckenlively, Officer Ruch interviewed B.S. in the presence of B.S.'s mother, B.H., and the girls' little brother, Matthew. B.S. told him "that daddy had used his fingers" and penetrated their vaginas, referring to herself and her sister, B.H. B.S. said that it occurred in their parents' bedroom at their old address at

9th and Monroe. He tried to talk with B.H., but she refused to make a statement. Officer Ruch then instructed Mrs. Heckenlively to take the two girls to the Child Protection Center.

On January 21, 1998, Mrs. Heckenlively took the girls to the Child Protection Center. There a pediatric nurse practitioner conducted a "sexual assault forensic examination" ("SAFE") on the two girls. The results of the SAFE examination were presented at trial. Although this examination revealed no abnormalities in the genital or rectal areas of either girl, the nurse practitioner explained that this finding could be consistent with either the presence or absence of sexual abuse.

At the Child Protection Center, the girls and their mother met with social worker Julie Donelon. After first speaking with Mrs. Heckenlively, Ms. Donelon videotaped her interviews with B.S. and B.H. Ms. Donelon testified at the trial, and her videotaped interviews with the girls were played for the jury. In the videotaped interview, B.S. said Heckenlively had touched her "private," *i.e.,* her genital area, in her mother's bedroom while they were living at her "old house" on 9th Street in Kansas City when she was six years old and in kindergarten. The incident, B.S. said, had occurred around lunchtime while B.S. was home sick from school and her mother was working at Shoney's. She, B.H., and their younger brother were taking a nap when Heckenlively called B.S. and B.H. into their parents' bedroom. Heckenlively was in the middle of the bed, and the two girls were on each side of him. B.S. said that he pulled down her pants and underwear while she was lying down on the bed. He touched the inside of her vagina with his hand or finger. She said she was watching as he put his hand inside her. She said Heckenlively did this twice; she told him to "stop" and he told her to

go back to her room. She stated that she went back to her room and fell asleep. B.S. also told Ms. Donelon that after the appellant touched her vagina, he pulled B.H.'s pants down and did "the same thing" to her. B.H. protested that she was "gonna tell mama," but he warned her that if they told, they would be in "big trouble," according to B.S. B.S. said that she and B.H. told their mother what had happened after they moved.

B.H. also gave a videotaped statement to Ms. Donelon. It, too, was introduced at trial. After initially saying "no," when asked if she had been touched around her buttocks or vagina in a way that she "didn't like," she later stated that her dad had pulled her pants down and touched her with a finger on the "outside" of her vagina. She said the incident had occurred at their "old house" when she was three years old and that her dad was "sitting on the couch" and she was standing while he was touching her. B.H. said that Heckenlively had instructed B.S. to go to her bedroom when the touching occurred, that her brother was in the room with her, and that her mother was at work. B.H. told Ms. Donelon that Heckenlively had touched her "two times," indicating on a diagram that the touching had occurred on her buttocks. The appellant had removed her clothes and touched her with his hands on the "outside of her buttocks." B.H. recalled that the second incident had occurred in the same room and under the same circumstances as the first incident, that her mother was at work, B.S. was in her bedroom, and her little brother was present. She said she did not tell her mother until they were no longer living with the appellant, but she did not testify that Heckenlively told her not to tell.

At trial, B.S. again testified that Heckenlively gave her a "bad touch" in her vagina with his finger. She stated that he

did it "two times." B.H. also testified, stating that Heckenlively gave her a bad touch on the outside of her private part with his hand.

Prior to the jury's verdict, a hearing was conducted, after which the court determined that Heckenlively was a persistent and predatory sexual offender and subject to the extended sentencing provisions in § 558.018, RSMo. After approximately six and one-half hours of deliberations, the jury returned verdicts of guilty of statutory sodomy in the first degree and child molestation in the first degree.

On October 6, 2000, the court denied defense counsel's motion for judgment of acquittal or, in the alternative, for a new trial. The court sentenced Heckenlively as a persistent and predatory sexual offender to life imprisonment without the possibility of parole for thirty years for the statutory sodomy conviction, and to a concurrent term of seven years imprisonment for the child molestation conviction.

### Point I: The *Batson* Challenge

■ At jury selection, the State challenged several of Heckenlively's peremptory challenges pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which prohibits the use of peremptory challenges so as to discriminate on the basis of race or gender. The trial court sustained the State's *Batson* challenge only as to Michael Smith, who is African American, and placed Mr. Smith on the jury.[1]

In his first point on appeal, Heckenlively (who is Caucasian) claims that the trial court "clearly erred" in sustaining the State's *Batson* challenge as to venireperson Michael Smith. Heckenlively contends that the defense articulated a race-neutral

reason for its use of a peremptory challenge against Mr. Smith—that Heckenlively saw Mr. Smith give him hostile looks during voir dire—and that the trial court failed to adequately consider the totality of the circumstances and rejected the explanation simply because the defense had used five of its six peremptory challenges to remove African Americans from the panel.

■ Our review of the trial court's ruling on a *Batson* challenge is limited to determining whether it is clearly erroneous. *State v. Pullen*, 843 S.W.2d 360, 362–63 (Mo. banc 1992). The court's determination of whether there was discrimination is a finding of fact. *State v. Antwine*, 743 S.W.2d 51, 66 (Mo. banc 1987). "[F]indings of fact shall not be set aside unless clearly erroneous...." *Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Antwine*, 743 S.W.2d at 66; *State v. Thurman*, 887 S.W.2d 411, 412 (Mo.App.1994). Because the trial court's determination of whether a peremptory strike was based on racially neutral grounds "largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Antwine*, 743 S.W.2d at 66 (quoting *Batson*, 476 U.S. at 98, n. 21, 106 S.Ct. 1712); *State v. Gray*, 887 S.W.2d 369, 385 (Mo. banc 1994).

■ There is a three-step procedure for trial courts to follow when confronted with a *Batson* objection: First, the party challenging the strike must raise a *Batson* challenge with regard to the specific veni-

---

**1.** Pertinent to the discussion of the State's *Batson* challenge is the fact that Heckenlively

is Caucasian, while Mrs. Heckenlively is African–American.

reperson struck and identify the cognizable racial group to which the venireperson belongs. *State v. Parker*, 836 S.W.2d 930, 939 (Mo. banc 1992). Then, the party exercising the peremptory strike must come forward with reasonably specific and clear race-neutral explanations for the strike. *Id.* Finally, if an acceptable reason for the strike is presented, the challenging party must show that the proffered reasons for the strikes were merely pretextual and that the strikes were racially motivated. *Id.*

Here, the State raised a *Batson* challenge to the defendant's proffered strike of venire-person Michael Smith. The State established a prima facie case for their challenge of the strike, based on the fact that Mr. Smith is African–American and was one of five African–Americans peremptorily stricken by Heckenlively. Heckenlively was then required to come forward with a racially neutral explanation for that strike. "The proffered neutral explanation 'must give a "clear and reasonably specific" explanation of Heckenlively's "legitimate reason" for exercising the challenges.'" *Antwine*, 743 S.W.2d at 64 (quoting *Batson*, 476 U.S. at 99, n. 20, 106 S.Ct. 1712). Heckenlively explained, *inter alia*, that the venireperson had given him "hostile looks" during the jury selection process. If the trial court accepted the proffered reasons as "racially neutral explanations," it would then be up to the State to prove that the Heckenlively's explanation was merely a pretext, and that his true reason for the strike was to discriminate racially.

In order for the trial court to determine whether the challenging party has carried the burden of proving purposeful discrimination, the trial court may take into account a variety of factors. *Parker*, 836 S.W.2d at 939. The primary factor however is the "plausibility of the ... explanations in light of the totality of the facts and circumstances surrounding the case."[2] *Id.* "*Batson* requires the trial judge to embrace a participatory role in voir dire, noting the subtle nuance of both verbal and nonverbal communication from each member of the venire and the circuit attorney himself." *State v. Rogers*, 753 S.W.2d 607, 610 (Mo.App.1988) (citing *Antwine*, 743 S.W.2d at 64).

Here, the court questioned the credibility of the "hostile looks" justification, stating:

> "[J]ust to be real blunt, hostile looks are just not going to get it when five out of the six strikes are, frankly, African Americans. .... [J]ust hostile looks is just not going to do it ... in this atmosphere. The law is that you have to have race neutral reasons."

After examining whether there were other similarly situated white males [*i.e.*, those who worked for the city] on the venirepanel, the court took the matter under advisement.

Eventually, the defense presented the court with a relevant case involving "hostile looks," *State v. Thurman*, 887 S.W.2d 411 (Mo.App.1994). In *Thurman*, the prosecutor based her reasons for striking the African American venireperson on her handwritten notes and her recollection that the venireperson "appeared hostile

2. Other factors that could have been considered by the trial court include: (1) the existence of similarly situated white jurors not struck; (2) the attorneys' demeanor or statements during voir dire; (3) the demeanor of the excluded venirepersons; and (4) any other objective factors bearing on the motive to discriminate, *i.e.*, prevalent conditions in the community and the race of the defendant, victim, and material witnesses. *See State v. Norton*, 904 S.W.2d 265, 269 (Mo.App.1995).

looking" and was "staring" at her and the assistant prosecutor in an antagonistic manner, and on questions about his educational and employment background. *Thurman,* 887 S.W.2d at 413. The trial court's acceptance of the explanation as racially neutral was affirmed. However, in *Thurman,* only one of the State's six peremptory strikes was used to exclude an African–American, and African–Americans were well represented in the racial make-up of the jury eventually selected. *Id.* at 413. Here, in contrast, Heckenlively attempted to use five of his six peremptory strikes to exclude African Americans.

■ In this case, the trial court had not noticed the hostile looks, nor had it heard from the defense attorneys or the prosecutor that they had observed any hostile looks. The court here *rejected* the explanation, whereas in *Thurman,* the court *accepted* the explanation. Because the trial court's finding "largely will turn on evaluation of credibility," the reviewing court should give great deference to those findings. *Rogers,* 753 S.W.2d at 612. If the trial court's "account of the evidence is plausible in light of the record viewed in its entirety, [an appellate] court may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Antwine,* 743 S.W.2d at 66. Because of the great deference accorded trial courts in their determination of the matter based on the totality of the facts and circumstances, we see no basis for concluding the

trial court erred in its ruling sustaining the State's *Batson* challenge to the defense's attempt to strike venireperson Michael Smith. Point denied.

### Point II: § 491.075 Out–of– Court Statements

■ On April 10, 2000, a pre-trial hearing was held, pursuant to § 491.075 RSMo 1994,[3] to determine the admissibility of the girls' out-of-court statements to their mother, the police officer, and the social worker. The State presented the testimony of Officer Brian Ruch, Mrs. Heckenlively, and social worker Julie Donelon, and the videotaped interviews of the girls. The court found, "based on the evidence presented, that the time, content, and circumstances of the ... statements by the children" provided sufficient indicia of reliability, and would, therefore, be admitted at trial.

Heckenlively argues, in his second point on appeal, that the trial court abused its discretion and plainly erred in finding that the time, content, and circumstances of B.S.'s out-of-court statement to Officer Ruch contained sufficient indicia of reliability and in admitting the hearsay statement, pursuant to § 491.075, RSMo. Heckenlively bases his argument, primarily, upon complaints about Officer Ruch's interviewing technique.

■ Generally, our review of the trial court's admission of out-of-court statements is conducted according to a determi-

---

3. Section 491.075.1 provides in relevant part: A statement made by a child under the age of twelve relating to an offense under chapter 565, 566 or 568, RSMo, performed with or on a child by another, not otherwise admissible by statute or court rule, is admissible in evidence in criminal proceedings in the courts of this state as substantive evidence to prove the truth of the matter asserted if:

(1) The court finds, in a hearing conducted outside the presence of the jury that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2)(a) The child testifies at the proceedings[.]

nation of whether the decision amounted to an abuse of discretion. *State v. Redman*, 916 S.W.2d 787, 792 (Mo. banc 1996). The trial court is vested with discretion to determine whether the statements contain sufficient indicia of reliability to justify their admission under § 491.075. *State v. White*, 873 S.W.2d 874, 877 (Mo.App.1994). The trial court will be held to have abused that discretion only if its findings are not supported by substantial evidence. *State v. Tringl*, 848 S.W.2d 29, 32 (Mo.App. 1993). Such statements are admissible under the statute, unless it is clear from the record that the trial judge abused his discretion in allowing the statements into evidence. *State v. Kelley*, 945 S.W.2d 611, 614 (Mo.App.1997).

Here, Heckenlively made no objection to Officer Ruch's testimony at the time it was admitted. The State claims he waived any error, and the admission of the statements cannot constitute grounds for reversal, even as "plain error." The State points out that B.S.'s testimony at trial was consistent with her out-of-court statements, and that she was subject to cross-examination regarding her trial testimony *and* her out-of-court statements. Heckenlively could not possibly have been prejudiced by the admission of the out-of-court statements, and thus this cannot provide a basis for reversing his convictions. The State cites several cases which have held that where, as here, the children testify at trial and are available for cross-examination, even the erroneous admission of a child's statements under § 491.075 cannot amount to reversible error. *See, e.g., State v. Chapman*, 936 S.W.2d 135, 138–39 (Mo. App.1996); and *State v. Bright*, 782 S.W.2d 91, 92 (Mo.App.1989).

In *State v. Brown*, 953 S.W.2d 133 (Mo. App.1997), the defendant also failed to preserve the issue for appellate review, in that, although he objected to the admission of the out-of-court statements at the 491.075 hearing, he failed to object when the statements were introduced at trial, leaving him with no alternative but to request "plain error" review on appeal. *Brown*, 953 S.W.2d at 139. The court rejected the argument that the objection at the 491.075 hearing served as an continuing objection at trial. *Id.* Heckenlively points to an exchange in which one of the defense counsel suggested to the other that she needed to ask for a continuing objection as to hearsay evidence, and the court stated, "As far as I'm concerned, the objections made yesterday in the 491 Hearing continue." But this exchange took place in the middle of Mrs. Heckenlively's testimony at trial, *after* Officer Ruch had already testified, been cross-examined and been released. The defense fails to present authority for the idea that the trial judge could retroactively breathe life back into an objection already waived. The trial judge's concern at that point was minimizing future, recurring objections; the court was not trying to resurrect an issue already waived. Thus, we do not consider the objection to be preserved.

We engage in plain error review when it appears there are facial grounds for believing that plain error has resulted in a manifest injustice or miscarriage of justice. *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995). We cannot say here that we see any facial indication that the admission of the out-of-court statements made to Officer Ruch resulted in any manifest injustice or miscarriage of justice. Therefore, we decline review of this point. Point denied.

### Point III: Finding of Predatory Sexual Offender Status

Prior to the jury's verdict, the State presented evidence to establish that, as to count I, statutory sodomy in the first de-

gree, Heckenlively was a persistent sexual offender and predatory sexual offender, as defined in § 558.018, RSMo Cum.Supp. 1996.

■■■ In the third point of error identified by Heckenlively, he complains that the trial court plainly erred and exceeded its jurisdiction in sentencing him as a predatory sexual offender because the State did not show the offenses occurred before the effective date of the act providing extended terms for predatory sexual offenders. The charged offense occurred between the dates of May 1, 1996, and January 14, 1997, and the extended term provisions for predatory sexual offenders did not go into effect until August 28, 1996.

In order to prove that Heckenlively had previously pleaded guilty to or had been found guilty of the felony of "forcible rape, statutory rape in the first degree, forcible sodomy, statutory sodomy in the first degree, or an attempt to commit any of those felonies," as required by the statute, the State submitted a certified copy of court documents from Orange County, California. The documents established that on October 12, 1990, Heckenlively pleaded guilty to the following offenses in California: Five counts of child molestation; two counts of forceful sexual penetration; and one count of oral copulation. Based on this information, the trial court determined that Heckenlively was a persistent and predatory sexual offender and subject to the extended sentencing provisions in § 558.018.

The State argues that *State v. Tivis,* 933 S.W.2d 843 (Mo.App.1996), forecloses Heckenlively from raising his two points of error with regard to sentencing (appel-

lant's Points III and IV). In *Tivis,* the defendant contended that he was entitled to the benefit of an amendment to the definition of "dangerous felony" where the amendment occurred after he committed the underlying offense. *Id.* at 847. Tivis claimed that § 1.160 entitled him to a retroactive benefit from the amendatory law. The court held that Tivis was not entitled to raise the contention for the first time on appeal, when it had not been raised in the trial court or in his postconviction motion.[4] *Id.* at 847–48. *Tivis* is not on point here. *Tivis* did not involve a claim in the nature of an *ex post facto* claim; instead, in that case the appellant sought retroactive benefit from an amendment.

In *State v. Jackson,* this court held that "[a]n enhanced penalty which violates the ex post facto laws works a manifest injustice." *State v. Jackson,* 896 S.W.2d 77, 84 (Mo.App.1995). In *Jackson,* the defendant was alleged to have committed the offenses with which he was charged between August 1989 and February 1992. The court observed that there was "clearly a one-year window of time" prior to August 28, 1990, the effective date of a statutory amendment, during which the defendant could have committed the alleged acts. *Id.* Sentencing under the amended version of the statute would have subjected the defendant to the greater punishment of life imprisonment for offenses which, had they occurred prior to the amendment's effective date, would have carried a maximum punishment of fifteen years imprisonment. The court opined:

> [W]e are unable to make a determination as to whether the sentences are in violation of the ex post facto laws be-

---

4. The court in *Tivis* also explained in footnote 3 that the point lacked merit—the amendment occurred after he committed the underlying offense—because the amendment was not an amendment of the law "creating the offense,"

and § 1.160 provides that the amendment after an offense was committed has no effect unless it is an amendment of the law creating the offense.

cause it is unknown whether the crimes alleged ... were committed [before the effective date of the statutory amendment]. However, since the state failed to establish that any of the offenses alleged in those counts were committed after [that date], the trial court could not sentence the defendant to the more severe punishment since some of the offenses could have occurred prior to the effective date of the amendment. ....

*Manifest injustice would result if these sentences were left uncorrected.*

*Id.* (citations omitted) (emphasis added).

As in *Jackson*, this court is unable to determine whether the offense was committed after the enhanced "predatory offender" provisions became effective on August 28, 1996, since the offense was alleged to have occurred between the dates of May 1, 1996, and January 14, 1997. Here, too, the State has failed to establish that the offense alleged was committed after the enhanced sentencing provision became effective; therefore, "the trial court could not sentence the defendant to the more severe punishment since ... the offense[] could have occurred prior to the effective date of the amendment." *See id.*

In this case, as in *Jackson*, sentencing under the amended version of the statute subjected Heckenlively to greater punishment. As a predatory sexual offender, Heckenlively was subject to the minimum sentence of life imprisonment without the possibility of probation or parole for thirty years for offenses which, had they occurred prior to August 28, 1996, would have carried a maximum punishment of thirty years without probation or parole under the then-existing "persistent" sexual offender provision of that same statute, or to a penalty of five years to life had Heckenlively been sentenced under § 566.062 (statutory sodomy in the first degree) without any sentence enhancement provi-

sion being applied. The amended version of § 558.018 mandates the more severe punishment provision: "[I]n no event shall a person found to be a predatory sexual offender receive a final discharge from parole." In *Jackson*, this court concluded that "[m]anifest injustice would result if the[] sentences were left uncorrected" and remanded for resentencing. Although the trial court could still sentence Heckenlively to thirty years without probation or parole, and any practical effect of resentencing may be doubtful, Heckenlively is, nevertheless, entitled to resentencing under *Jackson*. Accordingly, even though the issue was not raised in the trial court, we vacate the sentence as to the statutory sodomy in the first degree and remand the case to the trial court for resentencing.

### Point IV: Finding of Persistent Sexual Offender Status

■ Finally, Heckenlively asks for plain error review of his contention that the trial court erred in finding him a persistent sexual offender and in sentencing him as such on count I, because the State failed to present sufficient evidence from which the court could determine that Heckenlively had previously pleaded guilty to or been convicted of "forcible rape, statutory rape in the first degree, forcible sodomy, statutory sodomy in the first degree or an attempt to commit" those offenses, as required under § 558.018 for one to be found a persistent sexual offender.

Heckenlively explains that at the time of the prior California convictions, sodomy in Missouri could be committed only if an individual engaged in conduct involving the genitals of one person and the mouth, tongue, hand, or anus of another person. The exhibits submitted by the State showed that Heckenlively had, from January 1986 through June 18, 1989, engaged

in various criminal sexual conduct, but did not specify that Heckenlively had penetrated the victim's vagina with his penis (rape) or that Heckenlively engaged in conduct involving the genitals of one person and the mouth, tongue, hand, or anus of another person (sodomy). The certified copies of documents from the Superior Court of the State of California, as well as the applicable California statutes upon which these convictions were based, showed that Heckenlively, in 1990, pleaded guilty to five counts of child molestation, one count of "oral copulation" and two counts of "forceful sexual penetration"[5] involving a victim who was less than fourteen years old.

Essentially, Heckenlively argues that his California convictions did not meet Missouri's definition of "sodomy" because at the time he committed his offenses in California, "deviate sexual intercourse" was defined merely as "any sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another person," § 566.010.1(2), RSMo 1986, and did not encompass vaginal or anal penetration with foreign objects. In support of his argument, the defendant likens his case to that of *State v. Kelly,* 728 S.W.2d 642, 648 (Mo.App.1987), in which the court found a similar argument to be "valid," calling it "ingenious."

The State responds, again, that the claim is not deserving of plain error review. We agree. We see no indication of plain or evident error. As the State points out, the critical question is not whether Heckenlively's conduct in California met Missouri's definition of sodomy when those crimes were committed in the late 1980's, but whether his conduct met Missouri's definition of statutory sodomy, first degree, in 1996 and 1997, when the crimes charged in this case were alleged to have been committed.

The California charges, and Heckenlively's admissions to them, met Missouri's definition of statutory sodomy, first degree, as defined by § 566.062.1, RSMo 1994, *i.e.,* "deviate sexual intercourse" with a person under the age of fourteen. The charges, and Heckenlively's admissions to them, fit squarely within the second definition of "deviate sexual intercourse" in effect in Missouri at the time of the charged crimes: "a sexual act involving the penetration, however slight, of the male or female sex organ or the anus by a finger, instrument or object done for the purpose of arousing or gratifying the sexual desire of any person." § 566.010(1), RSMo 1994.

Thus, the *Kelly* argument and decision is of no avail to Heckenlively. Based upon Heckenlively's own description of his crimes in California, it is apparent that his acts would fit under the definition of first degree statutory sodomy in Missouri at the time the crimes in this case were committed. Point denied.

## Conclusion

Because, under *State v. Jackson,* Heckenlively is entitled to resentencing on the first degree statutory sodomy conviction, the sentence as to the first degree statutory sodomy is vacated and the case is re-

---

5. The "forceful sexual penetration" charges were based upon Cal. Stat. § 289(k)(1), which defines "sexual penetration" as the "act of causing the penetration, however slight, of the genital or anal openings of any person ... for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device, or by any unknown object."

Heckenlively's guilty plea petition states that between January 1986, and June 18, 1989, he twice "caused the penetration of the same child's anal/genital openings by a foreign object against her will and for the purposes of sexual arousal" and he acknowledged he had "engaged in substantial sexual conduct, to wit: masturbation and vaginal penetration."

manded to the trial court for resentencing. In all other respects, the judgment is affirmed.

LOWENSTEIN and BRECKENRIDGE, JJ., concur.