

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | |
| v. | ) | WD85913 |
| | ) | |
| | ) | OPINION FILED: |
| KENNETH DEWAYNE | ) | March 26, 2024 |
| PENDERGRAFT, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Adair County, Missouri**
**The Honorable Matthew J. Wilson, Judge**

**Before Division Two:** Anthony Rex Gabbert, Presiding Judge, and
Karen King Mitchell and Janet Sutton, Judges

Kenneth Pendergraft appeals, following a jury trial, his conviction of first-degree statutory rape, § 566.032,[1] for which the court sentenced him to forty years' imprisonment. Pendergraft raises a single claim on appeal: he argues that the trial court plainly erred in overruling his objection to and admitting State's Exhibit 3 (a video of a forensic interview with Victim) insofar as it lacked foundation for admission under

---

[1] All statutory references are to the Revised Statutes of Missouri, Supp. 2017.

§ 491.075 because no witness testified to the procedure or protocol used to interview Victim. Finding no error, we affirm.

## Background

In June 2020, when Victim was eleven years old, she lived with Father and her three brothers in Harris, Missouri. Pendergraft lived in a trailer behind Victim's home with his wife and three daughters. Victim and Pendergraft's daughters often played together, spending time at each other's homes.

In the early morning hours of June 28, 2020, Pendergraft's daughters were hanging out with Victim at her home; Father and Victim's brothers were also there working on a project of some kind. Around 2:00 a.m., Pendergraft knocked on Victim's bedroom window, and all four girls went outside where Pendergraft asked them if he could have one of Father's cigarettes. The girls retrieved a cigarette and brought it back outside to Pendergraft. After chatting for a bit, Pendergraft asked his daughters to leave so he could speak with Victim. Pendergraft then advised Victim that he wanted her to help him with something in another house. Victim accompanied Pendergraft to a nearby abandoned house, and he took her upstairs to a room with two chairs.

Pendergraft's daughters waited for Victim to return but became nervous when she did not return right away, so they went looking for her. Victim could hear the girls calling for her while she was in the room with Pendergraft. Victim saw Pendergraft with a backpack of some kind and then saw him appear to change clothes. Victim asked Pendergraft why he was changing in front of her, and he responded that it did not matter and he would not have cared if an 11-year-old girl changed in front of him. Victim

2

expressed concern that he would change in front of someone else when he was a married man, and Pendergraft told Victim that his wife "didn't really . . . pleasure him."

Victim was feeling very uncomfortable with the situation and tried to find a way out of it without yelling. Victim told Pendergraft that she needed to leave because people were going to be worried about her and come looking for her soon. Pendergraft told her that, if she left, she was just going to get in trouble. He then began touching her. Victim tried to get up to leave, but Pendergraft forced her back into the chair and removed her shorts and underwear.[2] Pendergraft then forced his penis into Victim's vagina repeatedly, causing her a great deal of pain.

In the meantime, Pendergraft's daughters went to Father and asked if Victim had come back home yet. Upon realizing that Victim was gone, Father went out searching for her. When Father was unable to locate Victim, he called his stepsister and his nephew to come help. After Stepsister and Nephew arrived, they all split up and began searching around town for Victim; Nephew drove a very loud truck, and they knew Victim would recognize the sound if she were near enough to hear it. After about an hour and a half, Stepsister saw Victim sitting in some wet grass crying, wearing only a t-shirt, with a smear of blood on her inner thigh. Victim was still in the abandoned house when she heard Nephew's truck and told Pendergraft she had to go, and he let her leave at that time.

---

[2] A subsequent search of the upstairs portion of the abandoned house revealed a latex glove, a sensual powder spray, a daily cleanser, a hand soap bottle, two pairs of shorts, and a pink sock.

Victim then told Stepsister what had happened, and Stepsister contacted the police. After a deputy sheriff showed up and took statements from everyone,[3] he advised that Victim would need to be examined at a hospital. Victim's grandmother had arrived by that time, and she took Victim to the hospital, where Father later joined them.

At the hospital, Victim was examined by Nurse, a Sexual Assault Nurse Examiner. During the examination, Victim stated that she had been hanging out with three friends when a neighbor tapped on the window and asked for a cigarette. The neighbor asked Victim to meet him at an abandoned house and asked the other girls to leave. He then took Victim upstairs in the abandoned house, where he raped her. Victim indicated that the experience "hurt a lot," and she asked him to stop. Victim further stated that, when it was over, the neighbor told her to go back home, enter through the back, and take a shower.

Based on Victim's description, Nurse examined Victim's genitalia, specifically looking for injuries or abnormalities. Victim was in so much pain during the examination that tears were streaming down her face. Because of Victim's discomfort, Nurse was

---

[3] In Victim's written statement, she wrote:

> Me and my friends were sitting in my dad[']s house and Kenny knocked on my window and said he needed a cigarette. So we went to go give him on[e], then he said he needed to talk to me alone[.] Then he took me to Ed and [T]essie[']s house and he took me to the upstairs and pulled out a whole bunch of stuff, and started to do uncomfortable things to me. He made me go in the other room and then he turn[ed] the flashlight off and got on top of me and pulled my pants down and put his thing in my front part and it really hurt and he just [kept] on doing that until he was satisfied and I told him to stop and he wouldn't. Then I come back up to my house.

unable to complete as thorough of an examination as she would have preferred. Nurse was, however, able to discern abnormal redness and an apparent injury to Victim's hymen, consistent with penetrative trauma.

The next day, Victim participated in a forensic interview at a Child Advocacy Center (CAC). The deputy sheriff investigating the case observed the entire interview through a live video feed while the interview was simultaneously video recorded. In the interview, Victim again stated that she and Pendergraft's daughters were in her room around 2:00 a.m. when Pendergraft knocked on the window and asked for a cigarette. She indicated that, after they gave Pendergraft a cigarette, he said he needed to speak with her privately, and he sent the other girls away. Pendergraft then took Victim to a nearby abandoned house by asking for her help retrieving something. Inside the abandoned house, he took her upstairs. Once they were upstairs, Pendergraft pulled things out of a backpack, turned off the flashlight, and then got on top of Victim and pulled her pants and underwear down. Then he raped her, which she described as putting his penis in her vagina. She said she was kept there for approximately three hours until they saw headlights through the window and heard Nephew yelling for Victim, and that is when Pendergraft let her go.

The State charged Pendergraft with one count of first-degree statutory rape under § 566.032. Following trial, a jury found Pendergraft guilty as charged, and the court sentenced him to forty years' imprisonment. This appeal follows.

**Analysis**

Pendergraft raises a single point on appeal. He argues that the trial court plainly erred in overruling his objection and admitting State's Exhibit 3 (the video recording of Victim's forensic interview at the CAC) without adequate foundation insofar as no witness testified to the procedure or protocol used during the interview. Finding no error, we affirm.

## I.    Standard of Review

A trial court is vested with discretion when determining whether to admit out-of-court statements offered under § 491.075. *State v. Heckenlively*, 83 S.W.3d 560, 567 (Mo. App. W.D. 2002). Accordingly, the court's decision is typically reviewed for an abuse of discretion. *Id*. at 566-67. Similarly, "[w]hether a sufficient foundation has been established for an exhibit is a decision within the broad discretion of the trial court." *State v. Minner*, 256 S.W.3d 92, 97 (Mo. banc 2008).[4]

Here, however, despite Pendergraft's objection to the admission of Exhibit 3 at both the pretrial hearing and during trial, he did not include this claim of error in his motion for new trial; therefore, he seeks plain error review on appeal.[5]

---

[4] "An abuse of discretion occurs when the trial court's decision is so against the logic of the circumstances then before it, or so unreasonable and arbitrary, that it shocks one's sense of justice and indicates a lack of careful consideration." *State v. Whittier*, 591 S.W.3d 19, 25 (Mo. App. E.D. 2019).

[5] "In jury-tried cases, allegations of error to be preserved for appellate review must be included in a motion for new trial . . . ." Rule 29.11(d) (including exceptions inapplicable here). All rule references are to the Missouri Supreme Court Rules (2022).

"Non-preserved issues are reviewed for plain error, if the error resulted in manifest injustice or a miscarriage of justice." *State v. Celis-Garcia*, 420 S.W.3d 723, 726 (Mo. App. W.D. 2014) (quoting *State v. Taylor*, 298 S.W.3d 482, 491 (Mo. banc 2009)). "Claims of plain error are reviewed under a two-prong standard." *Id*. at 726-27 (quoting *State v. Ray*, 407 S.W.3d 162, 170 (Mo. App. E.D. 2013)). First, "we determine whether there is, indeed, plain error, which is error that is evident, obvious, and clear." *Id*. at 727 (quoting *Ray*, 407 S.W.3d at 170). If we find plain error, we then consider "whether a manifest injustice or miscarriage of justice has, indeed, occurred as a result of the error." *Id*. (quoting *Ray*, 407 S.W.3d at 170). As the party seeking plain error review, Pendergraft "bears the burden of showing that plain error occurred and that it resulted in a manifest injustice or miscarriage of justice." *Id*. (quoting *Ray*, 407 S.W.3d at 170).

## II. The trial court did not err in admitting under § 491.075 the video recording of Victim's CAC interview.

Under section 491.075, out-of-court statements "made by a child under the age of fourteen . . . relating to an offense under chapter . . . 566" are admissible in criminal proceedings "to prove the truth of the matter asserted if . . . [t]he court finds . . . that the time, content and circumstances of the statement provide sufficient indicia of reliability[] and . . . [t]he child . . . testifies at the proceedings." § 491.075.1(1)-(2)(a). In making the reliability determination required by § 491.075.1(1), courts look to the totality of the circumstances and consider several non-exclusive factors. *State v. Antle*, 670 S.W.3d 66, 71 (Mo. App. W.D. 2023). Those factors include:

> (1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) lack of a motive to fabricate; and (4) knowledge of subject

matter unexpected of a child of similar age.  Other important factors include the lapse of time between when the acts occurred and when the victim reported them and the technique employed by the interviewer.

*Id*. (quoting *State v. Antle*, 657 S.W.3d 221, 228 (Mo. App. W.D. 2021)).  Additionally, "[w]e have consistently emphasized that a lack of leading questions, pressure tactics, and excessive prompting are important factors in finding that minor victims' out-of-court statements are spontaneous and have sufficient indicia of reliability." *Id*. at 71-72.

Here, the trial court held a pretrial hearing to determine admissibility of Victim's out-of-court statements made to Grandmother, Stepsister, and Nurse, as well as Victim's written statement and statements made during her CAC interview.  During the pretrial hearing, the trial court received testimony from Father, Stepsister, Grandmother, Nurse, Victim's mother, and the deputy sheriff, all concerning the circumstances surrounding the timing, nature, and substance of Victim's CAC disclosure.  The prosecutor advised the court that the CAC interviewer was not present to testify because she no longer worked at the CAC and, since leaving the CAC, had become essentially uncooperative with law enforcement regarding the interviews she conducted.

Following the pretrial hearing, the trial court determined that all statements, including those made during the CAC interview, "were made in such a time and manner with the content and circumstances of the statements as to provide a sufficient indicia of reliability."[6]  Pendergraft does not challenge admission of the statements made to

---

[6] Victim also testified at Pendergraft's trial.

8

Grandmother, Stepsister, or Nurse, nor does he challenge admission of Victim's written statement. His sole challenge is to her statements made during the CAC interview.

Pendergraft argues that, because no witness testified as to the procedure and protocol used during Victim's CAC interview, the trial court had no basis upon which it could determine that the statements bore sufficient indicia of reliability. We disagree.

The specific statements about which Pendergraft complains were presented to the court in a videotaped recording. "The party offering a videotape in evidence must show that it is an accurate and faithful representation of what it purports to show." *Minner*, 256 S.W.3d at 97 (quoting *Phiropoulos v. Bi-State Dev. Agency*, 908 S.W.2d 712, 714 (Mo. App. E.D. 1995)). "The foundation may be established through the testimony of any witness who is familiar with the subject matter of the tape and competent to testify from personal observation." *Id*.

Here, the deputy sheriff testified that he was present throughout the entire CAC interview and viewed it all in real time through a live video feed. He further testified that he had viewed State's Exhibit 3 and found it to be a fair and accurate depiction of the interview he witnessed. Thus, the State laid a sufficient foundation for admission of the video recording itself. And the trial court, upon viewing the recording could determine whether the interviewer used any "leading questions, pressure tactics, and excessive prompting." *See Antle*, 670 S.W.3d at 71. Additionally, the trial court had evidence before it of the circumstances surrounding the timing, nature, and substance of Victim's disclosure through testimony from Father, Stepsister, Grandmother, Nurse, Victim's mother, and the deputy sheriff. From that testimony, the court could evaluate the various

9

factors affecting reliability, such as (1) spontaneity and consistency; (2) Victim's mental state; (3) the absence of any motive to fabricate; and (4) the amount of time between the acts and Victim's disclosure. *See Antle*, 670 S.W.3d at 71. Thus, the trial court had before it sufficient evidence from which to determine the reliability of Victim's statements during the CAC interview, even without a witness testifying to the procedure and protocol for the CAC interview.

Furthermore, a similar argument to that raised by Pendergraft was raised by appellants in both *State v. Sanders*, 473 S.W.3d 675 (Mo. App. S.D. 2015) and *State v. Timbs*, 562 S.W.3d 404 (Mo. App. E.D. 2018). Sanders argued that "the 'time, content, and circumstances' of [the victims'] statements 'did not provide a sufficient indicia of reliability' in the absence at the section 491.075 hearing of the person who conducted the interviews." *Sanders*, 473 S.W.3d at 678. And Timbs argued that, "without testimony from the interviewer[] at the hearing, there was insufficient evidence that the time, content and circumstances of the interview provided sufficient indicia of reliability to support the admission of the recording at trial." *Timbs*, 562 S.W.3d at 407. But, in both cases, our sister courts held that "Section 491.075 does not expressly require the person conducting the interview of the child to testify at the section 491.075 hearing, but rather utilizes a general standard requiring a finding that the time, content and circumstances of the statement provide sufficient indicia of reliability." *Sanders*, 473 S.W.3d at 679; *see also Timbs*, 562 S.W.3d at 408 (same). We see no reason to question the logic in either case and adopt the holdings in both.

While Pendergraft acknowledges the holdings in both *Sanders* and *Timbs*, he argues that they further stand for the proposition that, when the interviewer is absent, *someone* must be present to testify to forensic protocol and procedure. We do not read *Sanders* and *Timbs* so broadly. While there were witnesses present in both cases who addressed the procedure and protocol, nothing in the courts' decisions required that evidence in order to uphold the trial courts' findings of reliability. In this case, Victim made spontaneous, repeated, and consistent statements within hours after the events occurred. Although the CAC interviewer did not testify at the § 491.075 hearing, there was still sufficient evidence from which the trial court could determine the reliability of Victim's statements as well as their admissibility under § 491.075. Thus, the trial court did not err, plainly or otherwise, in admitting State's Exhibit 3.

Point denied.

## Conclusion

The trial court did not plainly err in admitting State's Exhibit 3, the video recording of Victim's CAC interview. Its judgment and sentence are affirmed.

_____
Karen King Mitchell, Judge

Anthony Rex Gabbert, Presiding Judge, and Janet Sutton, Judge, concur.

11