**In the Interest of N.J.K., Appellant,**

v.

**JUVENILE OFFICER, Respondent.**

**No. WD 63012.**

Missouri Court of Appeals,
Western District.

July 27, 2004.

Kathleen A. Jeanetta, Kansas City, MO, for appellant.

James E. Herbertson, Kansas City, MO, for respondent.

Before PATRICIA BRECKENRIDGE, P.J., JAMES M. SMART, JR., and VICTOR C. HOWARD, JJ.

PER CURIAM.

This is an appeal from a Juvenile Court judgment sustaining the Juvenile Officer's petition, which alleged that the juvenile, N.J.K., committed the delinquent act of child molestation in the first degree. The issue is whether there was sufficient evidence to prove beyond a reasonable doubt that the juvenile committed the delinquent act. We affirm.

### Factual and Procedural Background

In early February 2002, N.J.K. (hereinafter, N.K.) was sixteen years old and living with his father and stepmother. On the evening of February 3rd, N.K. was at home with his stepmother, who was babysitting her two grandchildren, a four-year-old girl and her eight-year-old brother. N.K.'s father was not at home that evening. N.K.'s stepmother testified that she was in the upstairs family room while the three children played down in the basement. At some point, the eight-year-old came up to the family room and sat with Stepmother. The little boy eventually told her that his sister and N.K. went upstairs and told him not to come. Stepmother went upstairs to N.K.'s bedroom where she found the door closed and the light off. She opened the door, turned on the light, and found the little girl on the bed with

her pants and underwear pulled down. N.K., fully clothed, was also lying on the bed with his head about six to twelve inches from the little girl's "vagina area," according to Stepmother. Stepmother did not observe N.K. touching the little girl. Stepmother picked up the little girl, carried her downstairs, and called the police. Stepmother asked the little girl if N.K. had forced her to remove her clothing, and the little girl said "no." The police came to investigate, but no arrest was made.

Later that evening, the little girl's parents took her to Children's Mercy Hospital, where she underwent a physical examination to determine if she had been sexually assaulted or raped. There was no physical evidence that the child had been sexually assaulted, and no evidence was collected that incriminated N.K. The little girl made no statements regarding any alleged assault or molestation at that time.

About three weeks later, the little girl was interviewed by Julie Donelon at the Child Protection Center (CPC). In that videotaped interview, which was played at the hearing, the little girl denied that anyone had touched her inappropriately, and she did not mention N.K. at all. Ms. Donelon referred her for a sexual abuse assessment.

The sexual abuse assessment was conducted by Beth Banker at the CPC over three sessions during March. The first session was primarily a get-acquainted session at which the subject of sexual abuse was not broached. In the second session, the little girl identified the genital area on a drawing as the girl's "coochie."[1] The little girl was given Raggedy Ann dolls and asked to depict a scenario similar to what occurred on the night of the alleged molestation. Still, the little girl did not indicate

that any abuse had occurred. In the third session with Ms. Banker, the child stated that she understood about bad touches, she knew that the person doing the touching was the person at fault, and that she would tell her mommy if anyone touched her in a bad way. Toward the end of that session, the little girl stated that she wanted to forget the touching by N.K. that had occurred in N.K.'s room. She did not elaborate. Ms. Banker gave her anatomically correct dolls and asked her to show what kind of touching happened. She pointed to the genital areas on the girl doll and on the boy doll but did not say or do anything further. When asked if there was anything she wanted to tell N.K. about the touching, she replied, "Don't talk to [stating her own name] or be by her! Stop doing what you're not supposed to do." Ms. Banker recommended play therapy for the child to "address probable sexual abuse."

On March 14, in the midst of the sessions with Ms. Banker, the child's mother took her to the Metropolitan Organization to Counter Sexual Abuse for an assessment. The child's mother identified some behavioral problems the child had been having, including wetting her pants, sleeping problems, and "some sexualized play and talk." The child began attending weekly sessions with therapist Heather Mills. The sessions included discussions about different types of touches. Beginning in April and through May and June, Ms. Mills and the child read a book together entitled, "A Very Touching Book," which, according to Ms. Mills, discusses good touches, bad touches, and secret touches. Ms. Mills acknowledged that children learn a lot about their genitalia and about sexuality by reading that book. For the first four months of her therapy, the little girl made no disclosures that she

---

1. Ms. Banker testified that this terminology would be considered age-appropriate.

had been touched inappropriately. On July 18, however, after watching a video entitled "Little Bear"—which discusses child sexual abuse, the disclosure of such abuse, and "secret touches" on the Little Bear's breasts, vagina, and bottom—the little girl responded, after being asked, that she knew how Little Bear felt because that was what N.K. had done to her.

On August 13, Jan Chance, an investigator with Missouri Division of Family Services, went to the little girl's home to interview her. The child told Ms. Chance that when she was at her grandmother's house, N.K. had touched her "under her clothes" on her "private parts." The little girl indicated on a drawing where she had been touched, pointing to the breasts, genitals, and buttocks areas.

At her next therapy session, on August 15, the little girl told Ms. Mills that she wanted to talk about what N.K. had done to her. The little girl asked that her mother be with them. She asked if her mother could draw the pictures and tell the therapist what had happened. The therapist suggested that Mother draw the pictures and the little girl tell her what happened. The little girl then revealed to Ms. Mills, in front of her mother, that N.K. had touched her breasts and the inside of her vagina with his hands while her clothes were off. She also stated that N.K. had made her touch him and indicated where by pointing to the penis of a boy figure on a drawing her mother had made. Then, on August 19, when she was alone with Ms. Mills, and aided by anatomically correct dolls, she demonstrated what N.K. had done to her by putting the boy doll's hand on the girl doll's breast and genital area. She also put the boy doll's mouth to the girl doll's genital area and then stated,

"He licked me there." Finally, she put the girl doll's mouth on the boy doll's penis. When asked what else N.K. did, she stated, "he spit" but did not explain further.

On September 4th, the little girl was again interviewed by Ms. Donelon of the CPC. A videotape of that interview also was presented at the hearing. In that interview, the child revealed to Ms. Donelon that N.K. had kissed her mouth and touched her "boobies," "coochie," and "bottom" with his hands under her clothes. She pointed to these body parts on drawings. She stated that it happened at her grandmother's house and that it had happened more than once. She also talked about how N.K. said they were going to play hide-and-seek and how he had "pulled" her to come with him; about Stepmother's discovery of them in N.K.'s bedroom; and about Stepmother's actions thereafter, including calling the police. She denied, though, that there had been any oral-genital contact with N.K. or that he had touched her other than with his hands.

In the meantime, on May 30th, N.K.'s Father took him to the Lee's Summit police station to be questioned. Father claimed, vaguely, that N.K. had "confessed" to Father that he had "done this" or "committed this offense" on the little girl.[2] He, therefore, felt that N.K. should talk to the police. Despite being told that he could accompany N.K. while he was being questioned, Father chose not to do so. He also allowed N.K. to be interviewed without an attorney being present.

In October 2002, the Juvenile Officer filed a petition against N.K. alleging one count of child molestation in the first de-

**2.** Father testified only at the suppression hearing; he did not testify during the Juvenile

Officer's case in chief.

gree, in violation of section 566.067,[3] a class B felony. By this time, N.K. was residing with his mother in Kansas. N.K. filed a motion to suppress the statement he had given to the police. After a suppression hearing, at which Father and the interrogating officer testified, the court granted the motion to suppress. N.K. also moved to exclude the out-of-court statements made by the little girl to various witnesses, including Beth Banker, Julie Donelon, Jan Chance, and Heather Mills, on the basis that the hearsay statements lacked sufficient indicia of reliability and trustworthiness as required under section 491.075. Because the case was being heard by the court, the court reserved ruling on the motion until after the evidence had been presented.

At trial, the little girl was called to testify. She was unable to identify N.K. in the courtroom. She testified that she had discussed N.K. with her mother, but forgot what she told her mother about him. She also stated that she had discussed N.K. with Heather Mills, although she could not remember what about. Then she denied even discussing N.K. with Ms. Mills. There was no cross-examination, and the child was excused. The Juvenile Officer next offered the testimony of Stepmother, the testimony of Ms. Donelon of the CPC and the two videotapes of her interviews with the child, and the testimonies of Ms. Banker, Ms. Chance, and Ms. Mills.

N.K. presented no evidence and moved to dismiss. He also renewed his motion to exclude the out-of-court statements. Both motions were denied, and the Juvenile Officer's petition was sustained. In denying the motion to exclude, the court found that all of the statements made by the victim and introduced into evidence met the test

of reliability required by the statute and the case/law. At a dispositional hearing in May 2003, the trial court committed N.K. to the custody of the Juvenile Officer, but execution was suspended, and he was placed in the custody of his mother subject to certain rules of probation. He was required to attend weekly therapy sessions. The Commissioner's Findings and Recommendations were transmitted to the Family Court Administrative Judge, who entered judgment on June 3, 2003. As a result of that judgment, N.K. is required to register as a juvenile felony sexual offender in Missouri, pursuant to section 211.425, and in Kansas, where he now resides, pursuant to K.S.A., section 22–4901, *et seq.* N.K. appeals to this court.

## Point I: Sufficient Indicia of Reliability

In his first point, N.K. contends that the trial court abused its discretion in finding that the child's out-of-court statements contained sufficient indicia of reliability to satisfy section 491.075, in that the statements were inconsistent and contradicted by her earlier statements; were obtained only after months of repeated questioning and suggestive interviewing techniques; and did not reveal a knowledge of sexual matters inappropriate for a child her age.

### *Standard of Review*

We review the trial court's decision to admit out-of-court statements pursuant to section 491.075 for an abuse of discretion. *State v. Redman,* 916 S.W.2d 787, 792 (Mo. banc 1996). This court will find an abuse of discretion only where the trial court's findings are not supported by substantial evidence in the record. *State v. Heckenlively,* 83 S.W.3d 560, 567 (Mo.

**3.** All statutory references are to Revised Statutes of Missouri, 2000, unless otherwise not-    ed.

App.2002). "If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *State v. Costa*, 11 S.W.3d 670, 679 (Mo. App.1999) (*quoting Anglim v. Mo. Pacific R.R. Co.*, 832 S.W.2d 298, 303 (Mo. banc 1992)).

### Analysis

■■■ Under section 491.075.1, an out-of-court statement by a child under the age of twelve relating to an offense under Chapter 566 is admissible in evidence in criminal and juvenile [4] proceedings as substantive evidence to prove the truth of the matter asserted, but only if the court first finds that "the time, content, and circumstances of the statement provide sufficient indicia of reliability." [5] In making this determination, Missouri courts apply a "totality of the circumstances test," which involves consideration of several non-exclusive factors first identified in *Idaho v. Wright*, 497 U.S. 805, 821, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). *State v. Porras*, 84 S.W.3d 153, 157 (Mo.App. 2002). Those factors are: (1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) lack of motive to fabricate; and (4) use of terminology unexpected of a child of a similar age. *Redman*, 916 S.W.2d at 791 (*citing Idaho v. Wright*, 497 U.S. at 821, 110 S.Ct. 3139). The unifying principle behind these factors is that they all relate to whether the child was "particularly likely to be telling the truth when the statement was made." *Idaho v. Wright*, 497 U.S. at 822, 110 S.Ct. 3139. "Such 'particularized guarantees of trustworthiness' are required because statements admitted under [section 491.075] are not within a firmly rooted exception to the hearsay exclusionary rule." *State v. Werneke*, 958 S.W.2d 314, 318 (Mo.App.1997) (*quoting Redman*, 916 S.W.2d at 790).

Applying the factors, N.K. first asserts that the child's statements were neither spontaneous nor consistent and were contradicted by her earlier denials that any abuse had occurred.[6] A prime example of the inconsistency, according to N.K., is the child's indication to Ms. Mills that there had been oral-genital contact and her later denial of it in her September interview with Ms. Donelon. N.K. also notes that there was nothing to explain the child's denials of abuse in the beginning—no indication of fear on the part of the child, threats by the alleged perpetrator, or evidence of the child's desire to protect N.K. This suggests, says N.K., that the denials must have been true. N.K. points to the consistency in her statements, her initial denials with no indication that they were the result of fear or intimidation, and the lapse of time between her denials and her later incriminating statements. These things show, says N.K., that the later statements were not reliable or trustworthy and should not have been admitted.

■■■ We note that "in cases involving such young victims and sensitive and em-

4. Pursuant to section 491.699.1, the provisions of section 491.075 are applicable to juvenile proceedings.

5. Additionally, the child must: (1) testify at the proceedings; (2) be unavailable as a witness; or (3) be found by the court to be unavailable as a witness due to the significant emotional or psychological trauma that would result from testifying in the presence of the defendant. § 491.075.1(2). Here, the child testified at the proceedings although she was unable to identify N.K. and did not incriminate him in anyway in her testimony.

6. As noted above, the little girl denied at the time of the incident that anything had happened to her and in her first interview with Ms. Donelon she denied that she had been touched on her private parts.

barrassing subject matter," it is not uncommon for children's accounts of the abuse to contain some "variations, contradictions or lapses in memory." *Werneke*, 958 S.W.2d at 319; *see also State v. Benwire*, 98 S.W.3d 618, 624 (Mo.App.2003). "[I]nconsistent or contradictory statements by a young child relating a sexual experience does not, in itself, deprive the testimony of all probative force." *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995). The fact that the child at first denied and later admitted that she had been abused is not an unusual occurrence in cases such as these and does not, in itself, render her later incriminating statements unreliable and untrustworthy. The child likely was embarrassed or ashamed and may even have been afraid that she would be blamed if she revealed what had happened.[7] Ms. Mills testified that it is not uncommon for a sexually abused child of that age to be embarrassed and hesitant to talk about what has happened to them or to take several months to disclose the abuse. It is not always necessary that the child's statements occur at or near the time of the alleged abuse in order to be deemed reliable. *See State v. Jankiewicz*, 831 S.W.2d 195, 199 (Mo. banc 1992).

Furthermore, "there is a fundamental difference between inconsistency and describing different details at different times." *Porras*, 84 S.W.3d at 158 (quoting the lower court's explanation for finding that out-of-court statements were reliable). Here, the inconsistencies that N.K. identifies appear to be nothing more than the child simply not revealing every detail of what happened to her every time she recounted the events. The child's statements in her second interview with Ms. Donelon about what happened to her when her grandmother found her in N.K.'s bedroom included many details that corresponded with Stepmother's version of the event. Although the child early on denied that she had been abused, when she did disclose the abuse, her statements that N.K. had touched her and where he had touched her were consistent and clear.

N.K. also claims that two specific occurrences affected the child's mental state and provided her with a motive to fabricate. First, Ms. Mills related that in a session prior to her full disclosure of the abuse, the child asked "out of the blue" if her grandmother was going to go to jail "because ... of what [N.K.] did to me."[8] Second, just prior to the little girl's therapy session in which she fully disclosed the touching, the child's mother told Ms. Mills that one of the little girl's playmates had disclosed "secret touches" by the playmate's brother and that the little girl had discussed that with her mother and aunt. Mother told Ms. Mills that the little girl said she wanted to talk to Ms. Mills about the secret touches she had gotten. It was at her next therapy session that the child, with her mother present, disclosed the extent of the inappropriate touching. N.K. claims that the playmate's revelations about sexual abuse and the child's fear that her grandmother was going to jail both affected her mental state and provided her with a motive to fabricate. He does not clearly explain how. N.K. also points to the evidence that the little girl spoke with family members about the abuse as an indication that they may have influ-

---

7. Stepmother testified that she was very upset upon finding the little girl with N.K. and that she told the little girl: "little girls ... d[o]n't ... let little ... boys touch like that," a statement that could cause a child to believe she had done something wrong.

8. The child's mother had told Ms. Mills earlier that Stepmother said she had been arrested for beating N.K. Stepmother testified that she did not say that and that she had not been arrested.

enced her statements. Although N.K. speculates that these events affected the child's mental state and provided her a motive to fabricate, we cannot say that the evidence dictates such a conclusion. We do not agree that this evidence shows that the child's statements were unreliable, particularly when considered in conjunction with all the other circumstances surrounding the statements.

N.K. also contends that the child's statements did not reveal a knowledge of sexual matters inappropriate for a child her age. He points to the little girl's statements that N.K. touched her private parts—or her boobies, coochie, and bottom—with his hands; that N.K. kissed her; and, after being specifically asked, that N.K. had touched her on the "inside" of her vagina. Ms. Banker testified that the child's terminology was not inappropriate for her age.

■ The Court in *Redman* clarified that it is the child's knowledge of the subject matter and whether it is unexpected of a child of similar age, rather than the specific words the child uses that must be examined in the reliability analysis. *See Redman*, 916 S.W.2d at 792. The question is whether "[t]he nature of the statements as to sexual abuse are such that they fall outside the general believability that a child could make them up or would make them up." *Id.* at 791 (*quoting Idaho v. Wright*, 497 U.S. at 825, 110 S.Ct. 3139). The child's statement, "He licked me there," and her demonstrations of oral-genital contact, may both suggest knowledge of the subject matter well beyond her years and weigh in favor of reliability. While the child's terminology itself may not have been considered inappropriate, this factor, alone, does not show that her statements to the interviewers were unreliable or untrustworthy.

As noted above, the determination as to the reliability of a child's out-of-court statements must be based on the "totality of the circumstances." The *Redman* factors are merely a non-exclusive list of considerations intended to assist in assessing the totality of the circumstances. Rather than articulating a rigid test for determining when a child's out-of-court statements are reliable, the Supreme Court in *Idaho v. Wright* noted that the courts have "considerable leeway" in their consideration of all appropriate factors. 497 U.S. at 822, 110 S.Ct. 3139.

■ Interviewing techniques are also an important factor to be considered as part of the court's totality of the circumstances analysis. *See Costa*, 11 S.W.3d at 680; *State v. Kelley*, 945 S.W.2d 611, 615 (Mo.App.1997) ("Experience of the interviewer is a legitimate factor in determining reliability."). N.K. contends that the repetition of questioning and the use of "suggestive" interviewing techniques in this case renders the child's statements suspect, citing *Costa*, 11 S.W.3d at 681. N.K. claims that the interviewers' testimony shows that leading questions were asked, suggestive techniques were employed over a period of months, and N.K. was presumed all along to be the perpetrator. N.K. also points out that the child revealed the abuse to Ms. Mills only after reading a book and watching a video, both of which instruct children about their genitalia, sexuality, and inappropriate sexual touching. N.K. fails to note, though, that the child earlier indicated to Ms. Banker that there had been some inappropriate touching.

This court in *Werneke* noted the importance of findings that the statements were not the product of improper interview techniques and that the interviewers were experienced and trained. *Werneke*, 958 S.W.2d at 319. In this case, all of the testimony about the child's out-of-court statements came from disinterested individuals who were experienced and trained

interviewers. With the exception of Jan Chance's interview, which was conducted in the child's own home, the interviews with the child were conducted in neutral settings, which "weighs in favor of trustworthiness." *See Costa,* 11 S.W.3d at 681. All the child's disclosures came during sessions in which she and the interviewer were alone in the room with the exception of the one disclosure to Ms. Mills when the child had asked that her mother be present. There is no evidence in this case that the interviewers used leading or suggestive questioning or improper interview techniques and no evidence that the incriminating statements were the product of coercion.

After careful review of the record, including viewing the videotapes of Ms. Donelon's interviews with the child, we cannot say that the trial court abused its considerable discretion in finding the child's out-of-court statements reliable and trustworthy and admitting them in accordance with section 491.075. Point denied.

### Point II: Sufficient Evidence to Support Conviction

In his second point, N.K. asserts that there was insufficient evidence to support his conviction under section 566.067, because the only evidence of his guilt as to the elements of the crime came from the child's out-of-court statements, all of which were contradicted by the child's earlier statements. Because those statements lacked sufficient indicia of reliability, N.K. argues, they should not have been admitted. Absent those statements, there was not enough other evidence to convict him, he contends. There was no physical evidence; the child's testimony on the witness stand did not support the notion that a crime had been committed; Stepmother's testimony as to her observations did not meet the elements of the crime because

she did not observe any touching; and the evidence of N.K.'s alleged "confession" to Father (1) did not come into evidence in the Juvenile Officer's case-in-chief, only at the suppression hearing, and may not properly be considered by the court, and (2) Father's vague testimony as to the substance of N.K.'s confession does not meet the elements of the crime at any rate.

Juvenile proceedings are reviewed like any other court-tried case, *i.e.,* the judgment will not be disturbed unless it is against the weight of the evidence or it erroneously declares or erroneously applies the law. *C.L.B. v. Juvenile Officer,* 22 S.W.3d 233, 235–36 (Mo.App.2000) (citing *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976)). Determinations as to witness credibility and the weight to be given testimony are left to the trial court, and the court is free to believe none, part, or all of the testimony. *Id.* at 236. "[I]n determining the sufficiency of evidence, we view the evidence and reasonable inferences which may be drawn therefrom in the light most favorable to the verdict and we ignore all evidence and inferences to the contrary." *Id.*

Section 491.075.1 provides that an out-of-court statement of a child "is admissible in evidence in criminal proceedings in the courts of this state *as substantive evidence* to prove the truth of the matter asserted" under certain specific circumstances (emphasis added). As noted above, the child victim's out-of-court statements in this case were properly admitted under section 491.075.1. "Such statements, and any reasonable inferences that may be drawn from those statements, 'may alone constitute substantial evidence of an element of the offense charged.' " *Benwire,* 98 S.W.3d at 623.

N.K. contends, though, that even if the child's statements were properly admitted,

they still were insufficient to prove beyond a reasonable doubt that he committed the alleged act. We disagree. The child's statements were admissible as substantive evidence, and the substance of those statements satisfies the elements of the crime. Under section 566.067.1, "[a] person commits the crime of child molestation in the first degree if he or she subjects another person who is less than fourteen years of age to sexual contact." "Sexual contact" is defined at section 566.010(3) as "any touching of another person with the genitals or any touching of the genitals or anus of another person, or the breast of a female person, or such touching through the clothing, for the purpose of arousing or gratifying sexual desire of any person[.]" The four-year-old child's statements to her interviewers clearly satisfy this description. The sexual purpose behind N.K.'s touching of the little girl can be inferred from the circumstances. Even disregarding Father's testimony at the suppression hearing, the child's out-of-court statements, combined with Stepmother's testimony about the scene she observed the night of the incident, are sufficient evidence to support the conviction beyond a reasonable doubt.

Point denied.

### Conclusion

For the foregoing reasons, the judgment is affirmed.

Concurring Opinion by PATRICIA BRECKENRIDGE, Judge.

PATRICIA BRECKENRIDGE, Judge, concurring.

I reluctantly concur in the majority's decision to affirm the admission of the alleged victim's out-of-court statements under section 491.075. I do so, however, only because the standard of review requires this result. I write separately because I would find that the statements of the alleged victim were lacking in true spontaneity and were only marginally consistent and, therefore, should be inadmissible under section 491.075.1.

On the issue of spontaneity, the little girl's statements were made after she had received extensive education about sexual abuse, particularly inappropriate touching, and after she had been questioned repeatedly on the topic. Even the little girl's first statement incriminating N.K. was made after a discussion of inappropriate touching and multiple questions about what happened the night of the alleged molestation. Indeed, several of the little girl's statements were immediately preceded by some form of discussion about inappropriate touching, and all of her statements were elicited by questions from the interviewers or her therapist. As for consistency, the little girl's statements were consistent only in the very general allegation that N.K. had touched her on her breasts and genital area. The little girl was not consistent regarding whether this touching occurred under her clothes or with her clothes off; nor was she consistent in her statements regarding whether any other type of abuse, such as oral-genital contact, occurred. Additionally, the little girl supplied almost no details concerning the event other than the fact that touching occurred.

While I recognize that in cases involving a young victim, such as the little girl, it is common for the victim's statements " 'to contain some variations, contradictions or lapses in memory.' " *State v. Sprinkle*, 122 S.W.3d 652, 663 (Mo.App.2003) (citation omitted), under the totality of the circumstances in this case, I would find that the statements do not have sufficient indicia of reliability to be admissible.

Nevertheless, although I believe the evidence supported a different conclusion, I cannot say that the juvenile court's and my colleagues' determination that the statements possessed sufficient indicia of reliability was " 'clearly against the logic of the circumstances then before the court' " and was " 'so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.' " *State v. Costa*, 11 S.W.3d 670, 678–79 (Mo.App. 1999) (citation omitted). In reaching this conclusion, I find it significant that all the persons who elicited the statements from the little girl were experienced and trained interviewers and there was no evidence presented that their interview techniques were improper or coercive. Based upon the record before this court, reasonable minds can differ about the propriety of admitting the statements. Therefore, this court cannot find that the juvenile court abused its discretion. *Id.* at 679. For this reason, I concur in the result.