STATE of Missouri, Plaintiff–Respondent,

v.

Jeffery Allen DICKSON, aka Jeffrey Allen Dickson, Defendant–Appellant.

No. SD 30159.

Missouri Court of Appeals, Southern District, Division One.

March 22, 2011.

Rehearing Denied April 11, 2011.

Application for Transfer Denied May 31, 2011.

Janet M. Thompson, Columbia, MO, for Appellant.

Chris Koster, Attorney General, and Terrence M. Messonnier, Assistant Attorney General, Jefferson City, MO, for Respondent.

DON E. BURRELL, Judge.

Jeffery Allen Dickson ("Defendant") was convicted after a jury trial of child kidnapping, forcible rape, and two counts of forcible sodomy, all committed against Q.U.J., a minor ("Victim"). *See* sections 565.115, 566.030, and 566.060.[1] After waiving jury sentencing, Defendant was sentenced by the trial court to serve consecutive life sentences on each count. Defendant now timely appeals his convictions, alleging in three points relied on that the trial court committed reversible error by: 1) preventing Defendant from arguing to the jury that the crimes had been committed by his brother; 2) allowing Victim to hold a teddy bear while testifying; and 3) allowing Victim's mother to testify about statements Victim made at the hospital. Finding no merit in any of these contentions, we affirm.

**Factual and Procedural Background**

Defendant does not challenge the sufficiency of the evidence to sustain his convictions. The facts set forth herein are detailed only as necessary to address Defendant's specific points of alleged error

and are viewed in the light most favorable to the judgment.

On the evening of April 5th, 2008 (a Saturday), seven-year-old Victim accompanied her grandmother ("Grandmother") to an all-night card game held at the residence of Defendant's second-cousin, Gary McElroy, and McElroy's girlfriend, Keeona Stewart ("the residence"). For most of the evening, Victim watched television and played on-line computer games in a bedroom of the residence. Defendant had been living in the garage of the residence. Stewart testified that Defendant had braids in his hair that night, was wearing a black "do-rag," and that his braids were visible outside the do-rag. McElroy and Stewart testified that Defendant was the only person wearing a do-rag that evening. McElroy testified that Defendant was wearing white shoes. Defendant was "in and out" that evening and participated in the card game at various times.

Defendant had contact with Victim at the residence on two occasions that evening; coming to the bedroom occupied by Victim on one occasion to assist her with the computer, and once to bring her something to drink. In her trial testimony, Victim stated that a girl at the residence called him "Jeff."

McElroy testified that on the evening of the card game he took Defendant (at Defendant's request) to what was later identified as the house where the sexual assaults occurred (hereinafter "the burnt house"— the moniker given it by Victim) to get a television. Although the television was on the home's front porch, Defendant went inside while McElroy opened the trunk of his car. After Defendant came out of the home, the men loaded the television into McElroy's trunk.[2] Stewart testified that

---

1. Unless otherwise indicated, all statutory references are to RSMo Cum.Supp.2006.

2. The resident of the burnt house, Amanda Yokum, testified that her television was gone

after Defendant and McElroy returned with the television, Defendant left again. Stewart estimated that Defendant left around 1:00 a.m. and returned around 6:15 a.m., before Victim was discovered missing.

Sometime that Saturday night or during the early hours of the next morning, Defendant came to the bedroom window and lured Victim outside with a promise that she would receive a Barbie doll if she came with him. Victim testified at trial that the person who took her away had braids in his hair and wore a do-rag. Defendant took Victim to the burnt house, where he raped and sodomized her. Defendant then began choking Victim until she feigned death. Victim lost consciousness. When she awoke, there was smoke in the house. Victim quickly dressed and left the house, wearing only one shoe. During the police investigation of the incident, Victim was shown a photographic line-up and picked out a photograph of Defendant as the person who had hurt her. That photographic line-up was admitted into evidence at trial.

Around 3:30 a.m. Sunday morning, Fire Marshal Ben Basham was dispatched to investigate a report of a fire at the burnt house. Basham testified about his specific observations within the house and his conclusion that the fire was intentionally set in the northeast corner bedroom. After completing his investigation inside the house, Basham encountered Victim, who was wandering in the street, wearing just one shoe. Alarmed by Victim's appearance, Basham asked her if she was alright. Victim responded, "Somebody choked me." Basham tried to get additional information from Victim but couldn't really make out what she was saying, describing Victim's speech as "just kind of incoherent a little bit. Meek is, I guess, a good way to describe it, not very loud." Concerned

after the fire and she had given no one per-

about Victim's condition, Marshal Basham radioed for police officers and medical responders to be dispatched to his location.

Springfield police officer Daryl Ferris was one of the first persons to arrive. Ferris described Victim as "in and out of consciousness. She would talk to me for a moment and then kind of stare off at the dashboard or whatever." When asked to recount what Victim said when he asked her to tell him what had happened, Ferris testified: "The first thing she told me was that she had been choked by a black man. Then she told me that it had happened in the car, and then later she told me that it had happened at her grandmother's home." When asked if she said anything else that he remembered, Ferris said, "she also told me that she did not know who it was at that point."

A paramedic, Mattie Mabon, arrived and examined Victim. When asked to describe Victim's demeanor, Mabon testified: "she was still very lethargic, unable—it was hard for me to understand some of the things that she was saying . . . it was hard to understand because she wasn't getting the words out. They were garbled sometimes." Victim told Mabon "her neck hurt because she had been choked." Among other things, Mabon observed markings on Victim's neck that were consistent with choking and that Victim had lost control of her bladder and bowels and soiled herself.

In performing a forensic examination approximately 24 hours after Victim was found, nurse practitioner Kim Chapman observed that petechia, or redness from broken blood vessels, was present on the outside of Victim's face, as well as inside her mouth and ears. Likewise, Victim's genital and anal areas were swollen from very recent injury, tender, and leaking

mission to take it.

urine and stool. Chapman testified that "[i]t would take a significant amount of force[ ]" to cause those type of injuries to a child.

Around 6:00 a.m. Sunday morning, before the guests realized Victim was missing, Defendant returned to the residence, wearing different clothing than he had worn earlier, including a mustard-colored top, but still wearing the black head covering. The guests at the residence described Defendant as behaving nervously and said that he retired to a bedroom shortly after arriving.

At approximately 7:00 a.m., one of the guests realized Victim was missing, and a search for her ensued. The window to the bedroom Victim had occupied was open and the screen had been removed. The guests continued their search, spreading out into the surrounding neighborhood. Defendant—who did not participate in the search—was instructed to prepare for the anticipated arrival of the police by cleaning the residence. In addition to tidying up the residence, Defendant replaced the screen on the bedroom window and moved the chairs that had previously been around the card tables to the front porch. When McElroy got into his car to help search for Victim, Defendant asked if McElroy could drop him off at work. McElroy had never previously known Defendant to work on a Sunday, but he drove Defendant to a location a couple of minutes away.

After Victim had been found, McElroy returned to the residence and discovered on top of his washing machine a little chrome pipe with the shirt Defendant had been wearing when he returned to the residence earlier that morning. Later that day, Defendant called McElroy. McElroy told him that that he (Defendant) had been

implicated in the crimes. McElroy also found Defendant's do-rag in one of his kitchen drawers. When Defendant reported to his probation officer the next day, she notified the police of his presence. An officer then contacted Defendant at the probation office and collected forensic samples from Defendant's body.

Physicians who treated Victim at the hospital recovered organic material from Victim's right thigh and abdomen. Missouri State Highway Patrol DNA Analyst Malena Jimenez testified that she did not find semen in the swab samples taken from Victim, but she did find "allelic activity" in the DNA profile developed from the swab taken from Victim's thigh, meaning that the DNA found in that area did not belong solely to Victim. The analyst "did not feel there was enough there for [her] to do a [full DNA] comparison." So, she performed "Y–STR testing" on this sample in order to focus on male individuals. She explained that because "[t]he Y chromosome is passed directly from father to child[,]" the same profile for it would be shared by "anyone of a common paternal lineage." Analyst Jimenez compared the Y–STR profile developed from Defendant's samples with the Y–STR profile developed from the sample from Victim's thigh and determined that they were the same. McElroy and Stewart testified that Defendant and Terry Dickson ("Brother") shared the same father.

Victim informed Charity Muttert, a nurse who treated Victim in the emergency room at the hospital, that she had been choked. After Victim's mother ("Mother") arrived, Victim began to recount more details of her assault. Muttert was allowed to testify, pursuant to section 491.075.1,[3]

---

**3.** Prior to trial, the court conducted an extensive hearing, as permitted by section 491.075, to determine whether several witnesses—in-

cluding Mother—could testify to various out-of-court statements made by Victim. Defendant objected to such testimony on the

that while treating Victim, she overheard Victim tell Mother that "Grandmother's friend's brother" took her from the residence to a house where he "choked her and had sex with her." Mother confirmed that this was what Victim had said.

Additional testimony from Mother was that Victim first said she did not know her perpetrator's name but later told her that he was "Grandpa's friend" and had the same name as Grandpa. Mother testified that Grandpa's name was "Jeffery" but that she (Mother) did not know who Victim meant by "Grandpa's friend." Mother could not recall the details of Victim's description of the clothing the perpetrator had worn but did recall that Victim said the man wore a do-rag.[4] Mother also testified that Victim told her the perpetrator made her "puff" on a pipe that he put to her lips and then "her brain didn't work." Mother testified that at some point during the sexual assault, Victim asked Defendant if he was a child molester. Defendant said that he was and informed Victim that, now that she had asked that, he had to kill her.

After Victim had been released from the hospital, she was interviewed by Rachel Happel at a forensic interview center for children. Victim told Happel that she had been at Grandmother's friend's house where Grandmother played cards. Victim referred to this friend of Grandmother's as "Shelby." Victim said a "dude" choked and hurt her, but she did not know his name. The perpetrator was referred to throughout the interview as a "dude." Victim said the dude was at Shelby's house, Victim saw him there and Shelby knew who he was because he was in her family. Victim recalled that her perpetrator wore an orange shirt, yellow shoes, and a head-band of "all colors" and/or "light colors." Victim said that her perpetrator came to the window, told her to shut the bedroom door, and took her out through the window. Victim said that they walked to the burnt house. Victim told Happel that the dude put a pipe in her mouth and she showed Happel how the dude held her nose so that she breathed through her mouth. Victim said this caused her brain not to work. Victim described how the dude put his "private" in her private and in her "butt" and she demonstrated these events with anatomically correct dolls and drawings. She also described how the dude made her "kiss" his private. Victim also talked about acting like she was dead and the dude stopped choking her. After pretending to be dead, Victim said she fell asleep and when she woke up, she saw fire.

Later in the interview, Happel asked Victim if she had seen "the dude" before he came to the window, and Victim shook her head. Happel then asked Victim how she could know that the dude was in Shelby's family, and Victim said because she (Shelby) told her. Toward the end of the interview, Victim indicated that she had not seen the dude before, and Happel asked Victim a compound question of whether she had seen the dude before or earlier that night; Victim shook her head. The video of Victim's interview by Happel was played for the jury.

A police officer testified that the distance between the McElroy/Stewart residence and the burnt house was .6 miles.

grounds that Victim's statements were inconsistent and therefore lacked sufficient indicia of reliability. The trial court ruled that the State had satisfied the requirements of section 491.075 as Victim was under the age of fourteen; the conduct charged was within chapters 565 and 566; Victim was available to testify at trial; and the content and circumstances of the statements provided sufficient indicia of their reliability.

4. Mother had referred to this item as a "bandana" at the pretrial section 491.075 hearing.

Amanda Yokum, the person who actually resided at the burnt house, had left her house unlocked and was not at home when these crimes occurred. On the Friday before her house was set on fire, Yokum recalled that a car with two men stopped at her house while she was cleaning her car. One of the men got out of the car, approached, told her he had been watching her, and asked her if she "[had] a man." Yokum described this man as tall and slender, with long hair. She described the man who remained in the car as having braided hair. After the men left, they each came back separately later that day. The man who had originally left the car and approached her came back and asked her for a place to stay. Yokum told him that she did not know him. The man with braids later came back on foot and told her that the trunk of her car was open. Yokum identified Defendant at trial as the man with the braids and testified that she had previously identified Defendant in a photographic line-up. She also identified Brother in a photographic line-up as the tall, slender man. The photographic line-ups shown to Yokum were admitted into evidence at trial. Additional relevant facts will be set forth as needed to address Defendant's points.

## Analysis

### Point I: Scope of Closing Argument

■ Before closing arguments commenced, the trial court ruled that defense counsel would not be allowed to argue that Brother had committed the crimes charged to Defendant.[5] Defendant's first point alleges the trial court thereby abused its discretion because: 1) Defendant and Brother looked alike; 2) Brother lived near Grandmother and regularly visited Grandmother; 3) on the day prior to the abduction and assault, Brother had gone to the burnt house where the sexual assaults took place; 4) Brother frequented the residence from which Victim had been abducted; 5) the State's DNA evidence did not eliminate Brother, who shared a common paternal lineage with Defendant; and 6) Victim initially identified her attacker as the brother of a friend of her grandmother—a classification to which Brother belongs.

■ "Although courts are to be careful to refrain from unduly restricting closing arguments, they have the power to confine the arguments to issues raised by the pleadings and the evidence. A party may argue inferences justified by the evidence, but not inferences unsupported by the facts." *State v. Barton*, 936 S.W.2d 781, 783 (Mo. banc 1996) (citation omitted). Where the trial court abuses its discretion by prohibiting an essential argument that was justified by the evidence and the reasonable inferences that could be drawn therefrom, then the inquiry shifts to "whether the abuse 'prejudiced' the defendant's case; that is, whether there is a reasonable probability that, in the absence of the abuse, the verdict would have been different." *Id.* at 786. No such abuse occurred here.

Defendant did not offer any evidence from which a jury could reasonably infer that Brother committed the charged offenses. No evidence was presented that Brother was at or near the scene of the crimes when they occurred. In fact, McElroy and Stewart testified that while Brother had been at the residence on pre-

5. This ruling was in response to a motion *in limine* the State had filed which sought to prohibit Defendant from making the argument to the jury. The trial court ruled at that time that it was "not yet prepared to allow [Defendant] to suggest that [Brother] committed the crime."

vious occasions, he was *not* at the residence the night the crimes occurred. Victim described the person who took her away as having braided hair and wearing a do-rag. Other witnesses also testified that Defendant had braids in his hair that night and/or wore a do-rag. No evidence was presented that Brother had braids in his hair or was wearing a do-rag at the time these offenses were committed. And while Defendant and Brother had both been to the burnt house on the Friday before the fire, only Defendant was shown to have been there on the Saturday evening before the fire broke out early Sunday morning. Evidence that Brother had been at the burnt house a day-and-a-half before the fire was set and that he had been to the McElroy/Stewart residence on many other occasions did not constitute evidence connecting him to the crimes charged here.

The jury heard testimony that Defendant and Brother shared the same father. If the Y–STR DNA testing results constituted evidence of participation in the crime, then Defendant's father, Brother, and any other males who shared a common paternal lineage with them were equally implicated; it was insufficient to support an inference that Brother—as opposed to other male relatives—had committed these crimes.[6] And while Grandmother testified that Defendant and Brother looked alike, McElroy and another guest at the card game testified that they did not resemble one another. While Grandmother's testimony regarding resemblance and the DNA evidence was properly argued by Defendant as calling into question the accuracy of Victim's identification, it did not constitute evidence that Brother was Victim's attacker.

While Brother lived one street over from Grandmother's house and often visited it, these crimes did not happen at or near Grandmother's house. No evidence was presented that Brother had been watching Victim or otherwise knew that she was at the McElroy residence on the night the crimes occurred. It is questionable whether the fact that Brother's residence was near Grandmother's house had any value whatsoever in diminishing Victims' identification of Defendant; to argue that it constituted a fact from which the jury could reasonably infer that Brother was the perpetrator would be absurd. Similarly, while Victim's inconsistent statements about whether she had seen her perpetrator prior to the assault and her statements at the hospital that her perpetrator was the brother of a friend of her grandmother could appropriately be used to reduce any weight the jurors might attach to Victim's identification, none of it was sufficient to connect Brother to the crimes.

Defendant argues that "[t]he evidence support[ed] a finding that [Defendant] was [Victim']s grandmother's 'friend' and that [Brother] was the 'friend's brother.'" There are two problems with this argument. First, it overlooks Victim's statements to Happel that she had been at Grandmother's friend's house where Grandmother played cards and that she called this friend, "Shelby." While Victim told Happel that she did not know the name of the "dude" who choked and hurt her, Victim said he was a relative of Shelby. No evidence was presented that: (1) the friend referred to by Victim was anyone other than Shelby; and (2) Shelby was Brother's sister. As a result, Victim's statements cannot be used to support an argument that Defendant was the "friend"

---

6. McElroy testified that Defendant had four brothers. While McElroy indicated that Defendant and Brother had the same father, he did not address the paternity of Defendant's other three brothers.

Victim was referring to, thereby implicating Brother. Second, Defendant cannot rely on Victim's statement as supporting an inference that Brother was Grandmother's friend's brother because there was no evidence that Victim knew Defendant and Brother were brothers.

In sum, while all of this evidence was rightfully admitted at trial and could properly be used by Defendant to cast doubt on the strength of the State's case against Defendant by diluting the DNA evidence and calling into question the reliability of Victim's identification of Defendant as the perpetrator, specifically arguing that Brother was the true perpetrator of these crimes would have impermissibly extended beyond the reasonable inferences to be drawn from the evidence and was appropriately prohibited by the trial court. *See State v. Richardson*, 923 S.W.2d 301, 314–15 (Mo. banc 1996) (where the evidence did not support an argument that the defendant was not present when the victims were murdered and the trial court did not err in excluding such an argument).

Apart from this specific, narrow limitation of closing argument, Defendant was afforded wide latitude in presenting and arguing his theory of misidentification to the jury. In his opening statement, Defense counsel told the jury that the evidence would show that Brother lived in Springfield at the time of these offenses. He stated that "anybody who had the same paternal lineage as [Defendant] would also be an exact match with that Y chromosome [identified from a sample taken from Victim]." Defense counsel told the jury that Defendant and Brother shared the same father and that Brother "frequently" went over to the burnt house where Victim was sexually assaulted. He stated that Brother was identified by Yokum as the person who came to her house with Defendant the Friday before and that

"[Brother] was basically hitting on her, and ... [he] came back later that night saying his girlfriend had kicked him out of the house and could he stay with her...." Defense counsel told the jury that Brother "just lived one street over from [Grandmother] ... where [Victim] was taken pretty much every weekend." He told the jury they would hear that Grandmother told police that Defendant and Brother "look[ed] exactly alike."

As noted above, evidence generally consistent with the assertions contained in Defendant's opening statement was then presented at trial. This is *not* a case where Defendant was improperly prohibited from presenting evidence supporting the possibility that someone other than Defendant had committed these crimes. As the trial court noted,

> During the presentation of the evidence in this case the [trial c]ourt did not limit the Defendant on what evidence he offered, and indeed, there were no offers of proof on any evidence that was purportedly excluded, and that included any evidence that might somehow connect [Brother] to the commission of this crime.

In closing argument, defense counsel argued that the case was not about whether something had happened to Victim but about whether Defendant was the person who had committed the crimes charged. He contended that "[Defendant] is not the person that committed this crime." He suggested that Victim's use of the name "Jeff" resulted from her hearing and repeating what other people had said. Counsel reminded the jury that Victim had stated her attacker wore yellow shoes and an orange shirt, but that the evidence was that Defendant was wearing white shoes and a yellow shirt. Counsel reminded the jury that Brother went to the burnt house the day before these crimes occurred and

was acting oddly; that Grandmother believed Defendant and Brother looked alike; that Victim initially stated the attacker was her "grandmother's friend's brother"; and that Victim at one point said she had not seen her assailant before he appeared outside the bedroom window.

Defendant was allowed to argue that some of the guests at the card game were not fond of Defendant and that Grandmother had a motive to incriminate someone shortly after the assault. Counsel argued that Victim's identification of Defendant as the perpetrator was tainted because her statements changed once Grandmother and her friends arrived at the hospital and began to discuss Defendant with Victim. Moreover, counsel reminded the jury that the DNA evidence collected from Victim's thigh did not definitively implicate Defendant and that anyone who shared a paternal lineage with Defendant would also be a positive match for that DNA sample. Counsel reminded the jury that Jimenez testified that scrapings from Victim's fingernails did *not* match DNA taken from Defendant, but there was an insufficient amount of DNA to perform the Y–STR test. Counsel was thereby able to argue to the jury that DNA evidence collected from beneath Victim's fingernails was surely that of her attacker and did not match Defendant's DNA sample. Apart from being allowed to mention Brother by name, Defendant was allowed to argue that the jury could not be firmly convinced of Defendant's guilt because the evidence did not exclude the possibility that someone other than Defendant, especially a male relative, had committed the offenses.

Thus, Defendant's reliance on *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006), and *State v. Butler*, 951 S.W.2d 600 (Mo. banc 1997), is

misplaced. In *Holmes,* the Supreme Court held to be unconstitutional a state rule of evidence that precluded a defendant from presenting evidence of third-party guilt whenever there was forensic evidence strongly supporting the defendant's guilt because it violated the defendant's right to have "a meaningful opportunity to present a complete defense." *Id.* at 331, 126 S.Ct. 1727 (quotations omitted). In *Butler,* in the context of an ineffective assistance of counsel claim, our supreme court held that "[i]f defense counsel had obtained this 'direct connection' evidence [linking a nephew to the murder] and presented it to the trial court, an abundance of other evidence showing [the nephew] had motive and opportunity to commit the crime would have been admissible." 951 S.W.2d at 609. As earlier noted, Defendant was not precluded from introducing evidence; he was simply prohibited from arguing that *Brother* had committed the crimes because none of the evidence directly connected Brother to them.

While a trial court should exercise caution in restricting argument, its ruling here was supported by the lack of any evidence directly connecting Brother to the offenses and was certainly not so arbitrary and unreasonable as to shock our sense of justice and indicate a lack of careful consideration. Defendant's first point is denied.

### *Point II: The Comfort Item*

■ Defendant's second point alleges the trial court abused its discretion by allowing Victim—over Defendant's objection—to testify while holding a stuffed animal because "the State made no showing that [Victim] required that item in order to testify coherently nor that the process of testifying in court was so emotional that holding the item would facilitate her testimony and, [sic] letting [Victim] hold the

stuffed animal created inordinate prejudice, underscoring [Victim]'s age and innocence." Defendant's point also asserts that "the State" failed to comply with section 491.725, a statute Defendant acknowledges "had not yet gone into effect at the time of trial." [7]

 "The trial court has considerable discretion in matters regarding examination of witnesses. 'The exercise of that discretion should not be disturbed on appeal unless it has been abused or substantial harm has been improperly done to the complaining party.'" *State v. Powell*, 318 S.W.3d 297, 302–03 (Mo.App. W.D.2010) (quoting *State v. Gollaher*, 905 S.W.2d 542, 546–47 (Mo.App. E.D.1995)) (citation omitted). "Whenever a courtroom arrangement is challenged as inherently prejudicial, the court must consider whether the practice presents an unacceptable risk that impermissible factors will come into play which might erode the presumption of innocence." *Gollaher*, 905 S.W.2d at 547 (citing *Holbrook v. Flynn*, 475 U.S. 560, 570, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)). If the practice itself is not inherently prejudicial and no actual prejudice is demonstrated, then the trial court did not abuse its discretion. *Id.*

Defendant's allegation of error is similar to the complaint asserted in *Powell*, where the eleven- and sixteen-year-old victims of sexual assault testified while holding teddy bears. 318 S.W.3d at 302. Powell argued there was no showing that the witnesses were unable to testify without the comfort items. *Id.* In determining whether the trial court had abused its discretion, the western district of our court considered that there was nothing to suggest that the toys were used to engender the sympathy of the jurors; no reference to the teddy bears was made in the presence of the jury; and the witnesses were testifying about traumatic events. *Id.* at 303–04. Ultimately, it held that the trial court had not abused its discretion by allowing the witnesses to testify while holding the teddy bears because, after observing the witnesses, the trial court properly balanced the utility the comfort items offered the witnesses against the potential for prejudice to the defendant. *Id.* at 304.[8]

When we consider the same factors considered in *Powell*, we conclude that no abuse of discretion occurred in the instant case. Defendant now asserts that the prosecutor failed to demonstrate that Victim required the teddy bear in order to testify coherently or that her testimony would be so emotional that the teddy bear

---

7. Assuming Defendant was referring to the trial court when he referred to "the State," he cites no authority for the proposition that a court may commit reversible error by failing to follow the provisions of a statute not yet in effect. We consider the argument abandoned and will not address the matter. *See State v. Irby*, 254 S.W.3d 181, 194 (Mo.App. E.D. 2008) (where the reviewing court declined to address an argument unsupported by authority).

8. In reaching this conclusion, the Western District ended its opinion with the following cautionary note:

We recognize that the children's ages (eleven and sixteen) may have counseled against

the need for such accessories. We also emphasize that trial courts must be cognizant of the possibility that comfort items or other accommodations for minors may unfairly engender sympathy for complaining witnesses. When an objection is raised, courts should require some explanation of the need for such items, particularly when the items will be used during the testimony of teenage children. Nevertheless, in this case, we conclude that the trial court properly weighed the impact of the teddy bears on the witnesses and the jury, and did not abuse its discretion in overruling Powell's objection.

*Id.*

was needed to facilitate her testimony. This is a change from his position at trial, where in explaining his objection to the procedure, defense counsel told the trial court that "this testimony is going to be highly emotional[.]" At this point in the proceedings, the trial court had also heard evidence that Victim, a seven-year-old child at the time, was kidnapped, raped, sodomized, left in a burning house, and found wandering alone in the street in the wee hours of the morning. Victim was only eight years old at the time of trial. The trial court found that the teddy bear would enable her to testify more comfortably and completely, thereby assisting the jury in determining the facts of the case.[9] The trial court balanced the benefit the comfort item would provide Victim (who was significantly younger than the eleven- and sixteen-year-old witnesses in *Powell*) against any potential prejudice it might cause Defendant.

Moreover, no such prejudice exists here. In his opening statement, defense counsel referred to Victim as "a young girl that's been through something tragic" and conceded that "a horrific thing [ ] happened to her." Defendant's trial strategy was not to contest that a young child had been taken and brutally sexually assaulted; it was simply to show that this awful thing had been done by someone else. As a result, to permit a young child the comfort of holding a teddy bear while telling strangers the admittedly horrific things that had been done to her did nothing to negatively affect that strategy. In addition, nothing in the record suggests that the teddy bear was ever referred to in the presence of the jury or used in any way to attempt to engender its sympathy. Point II is denied.

### Point III: Indicia of Reliability of Hearsay Statements

■ Defendant's final allegation of error contends the trial court abused its discretion in permitting Mother to testify, as permitted by section 491.075, to certain out-of-court statements Victim made about the identity of her attacker and the circumstances surrounding her assault. Defendant's objection at trial and on appeal is that the statements lacked sufficient indicia of reliability.

We review for an abuse of discretion a trial court's admission under section 491.075 of what would otherwise constitute inadmissible hearsay. *N.J.K. v. Juvenile Officer*, 139 S.W.3d 250, 255 (Mo.App. W.D.2004). An abuse of discretion occurs only when the trial court's findings are not supported by substantial evidence in the record. *Id.* The trial court did not abuse its discretion if reasonable persons could have differed about the correctness of the ruling. *Id.* at 256. We also review for prejudice, as any erroneous admission must also have deprived the defendant of a fair trial. *State v. Norris*, 237 S.W.3d 640, 645 (Mo.App. S.D.2007). Generally, if other evidence admitted without objection suf-

9. As also noted in *Powell*,

Courts often allow non-standard procedures in cases involving the examination of minors in sexual abuse cases:

Young children, who are victims of sexual abuse, have great difficulty in recounting to juries the sordid details of their painful experience. Wide latitude should be granted to trial courts so that such victims can recount their experiences without being overwhelmed by crippling emo-

tional strain. Their testimony is often of critical importance since they are often the only occurrence witness.

*State v. Pollard*, 719 S.W.2d 38, 42 (Mo.App.1986). However, behavior or argument designed solely to appeal to the jury's emotional sympathy for a witness is irrelevant and, therefore, improper.

*Id.* at 303 (quoting *State v. Pollard*, 719 S.W.2d 38, 42 (Mo.App. E.D.1986)).

ficiently established essentially the same facts, the challenged evidence cannot create undue prejudice because it is simply cumulative of other properly admitted evidence. *Id.*

Section 491.075.1 provides that "[a] statement made by a child under the age of fourteen relating to an offense under chapter 565, 566, ... is admissible ... as substantive evidence to prove the truth of the matter asserted if: (1) The court finds ... that the time, content and circumstances of the statement provide sufficient indicia of reliability; and (2)(a) The child testifies at the proceedings[.]" As previously indicated, the only element challenged by Defendant is whether Victim's statements were supported by sufficient indicia of reliability.

Defendant asserts that Victim's statements to Mother were unreliable because they were the product of suggestive influences of Grandmother and others who visited her in the hospital after the assault. Specifically, Defendant notes that Victim initially told Muttert that she did not know her attacker, then told Mother the attacker was her "grandma's friend's brother," then finally—after Grandmother and others had arrived at the hospital—identified Defendant as her attacker. Defendant also points out that Victim told Happel "three times that she had never seen the man who abducted her before he appeared at the bedroom window." Similarly, Defendant notes that while Victim told Happel that her attacker wore a head covering that was comprised of all colors or light colors, Mother testified that Victim told her while in the hospital that her attacker had worn a black head covering. Defendant further notes that Victim told Happel that someone named "Shelby" told Victim that the perpetrator was Shelby's relative,

thereby demonstrating that Victim was exposed to third-party influence. Finally, Defendant references Mother's deposition testimony where she purportedly admitted that one of the guests, Sharon Hill, had discussed the color of Defendant's head covering with Victim.[10]

■ In determining whether these pretrial statements by Victim possessed sufficient indicia of reliability, we apply a totality of the circumstances test that involves consideration of several non-exclusive factors. *N.J.K.*, 139 S.W.3d at 256. These factors include: (1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) lack of motive to fabricate; and (4) use of terminology and/or knowledge of matters unexpected for a child of a similar age. *Id.* The ultimate issue is "whether the child was 'particularly likely to be telling the truth when the statement was made.'" *Id.* (quoting *Idaho v. Wright*, 497 U.S. 805, 822, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990)).

At the pre-trial hearing on the matter, Defendant argued that Victim's mental state may have affected the reliability of her statements. Because this claim was not included in his brief, we assume Defendant has abandoned it. Turning to the remaining factors, Victim's statements were spontaneous in that they were made near in time to the assault and she answered the questions without being prompted, cajoled, or coaxed. *See State v. Gillard*, 986 S.W.2d 194, 197 (Mo.App. S.D. 1999). Defendant does not suggest that Victim had any motive to fabricate her statements or that a child her age would know about such matters and therefore be able to make them up. Consequently, the only factor Defendant presses on appeal is

---

10. We cannot verify the validity of this assertion as Mother's deposition was not included in the record on appeal or deposited with this court.

the lack of consistency in Victim's statements.

In cases involving young victims of sexual assault, "it is not uncommon for children's accounts of the abuse to contain some 'variations, contradictions or lapses in memory.'" *N.J.K.*, 139 S.W.3d at 256–57 (quoting *State v. Werneke*, 958 S.W.2d 314, 319 (Mo.App. W.D.1997)). Simply because a young child may have made inconsistent or contradictory statements about events surrounding a sex act does not mean that the statements lack probative value. *N.J.K.*, 139 S.W.3d at 257. Further, children sometimes recall different, but not necessarily inconsistent, details at different times. *Id.* Considering the horrific nature of the circumstances at the time the statements were made, and the fact that the remaining *N.J.K.* factors supported a finding of reliability, we are not prepared to say that the trial court abused its discretion in allowing Mother to testify about them.

Even if we were prepared to do so, it would not result in a reversal as Defendant would be unable to demonstrate the necessary prejudice. Victim's trial testimony was consistent with Mother's recount of her out-of-court statements. This made the challenged statements cumulative of other unchallenged evidence. *See State v. Placke*, 290 S.W.3d 145, 154 (Mo.App. S.D. 2009). Victim was also subjected to cross-examination and could have been impeached with her inconsistencies. "[P]rejudice will not be found from the admission of hearsay testimony where the declarant was also a witness at trial, testified on the same matter, and was subject to cross-examination because the primary defects in hearsay testimony are alleviated." *State v. Steele*, 314 S.W.3d 845, 850 (Mo. App. W.D.2010). In *Placke*, the minor victim's statements to her grandmother were offered pursuant to section 491, but the trial court did not specifically rule whether the requirements of the statute had been satisfied. 290 S.W.3d at 155–56. The minor victim also testified about the statements at trial and was cross-examined. *Id.* at 156. The circumstances here were similar to those in *Placke*, where no prejudice was found.

Defendant's final point is denied, and the judgment of the trial court is affirmed.

BARNEY, P.J., and LYNCH, J., Concur.